## Downey v. Price Chemical Company.

## The Proto-Feed and Guano Company v. Downey.

### (Decided July 1, 1924.)

### Appeals from Jefferson Circuit Court (Common Pleas, First Division).

1. Sales—Evidence Held to Sustain Finding Unground Tankage Not as Required by Contract—Evidence held to sustain finding that article furnished was not unground garbage tankage contracted for.

2. Sales—Implied Warranty that Kind of Articles Sold to be Furnished.—There was an implied warranty to furnish kind of article sold and described, even though contract expressly excluded any "guaranty."

3. Appeal and Error—Error in Computing Damages May be Corrected Without Reversal.—Entire judgment should not be set aside and a new trial had of whole case by reason of error in computing damages for nondelivery of article contracted for, at 50 cents a ton on the whole amount, when part had been delivered, since the error may be corrected on a return of case.

O. H. HARRISON for appellants.

W. PRATT DALE for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming the judgment in each case.

On October 30, 1919, the appellee and defendant below, Price Chemical Company, a corporation, by written order made through the brokerage firm of Davidson Commission Company, agreed to purchase from W. J. Downey, appellant in the first case in the caption and doing business in the firm name of W. J. Downey & Company, one thousand tons of "City of Chicago unground garbage tankage" at $8.00 per ton f. o. b. cars Chicago, Illinois, and to be shipped at seller's option under directions of the purchaser at any time during the months of November and December, 1919, and January, 1920. The contract expressly stated that "no guarantee of any kind given."

On the next day it gave through the same commission company another order for a like quantity of the same material and at the same price to the appellant and plaintiff below in the second case in the caption, the Proto-Feed & Guano Company. Following that defendant gave shipping instructions to plaintiff, Downey, under which he shipped to it and to some of its customers elsewhere, 174 tons of the alleged purchased article. which quantity was accounted for and paid for by defendant at the contract price. Defendant in the second case, Proto-Feed & Guano Company, also made some sample shipments amounting in the aggregate to 47 tons, which was likewise received and paid for by defendant. There remained unshipped of the quantity of material bought from Downey 826 tons and of the quantity bought from the Proto-Feed and Guano Company 953 tons, all of which defendant declined to accept, receive or pay for

upon the ground that the material shipped and from which plaintiffs proposed to fill the entire contracts did not correspond with the description and was not of the kind, quality and classification of the article represented and which it purchased under both contracts, and these two separate actions were filed in the Jefferson circuit court against defendant to recover the difference in market value f. o. b. cars Chicago between the unshipped quantity of the article covered by the contracts on the day it should have been accepted by defendant, and the price agreed to be paid in the contracts, which difference plaintiffs averred was $2.50 per ton; the price having declined in the meantime as alleged from $8.00 per ton f. o. b. cars Chicago to $5.50 per ton. The amounts demanded on that basis and for which plaintiffs sought judgment were $2,065.00 in the action brought by Downey and $2,380.25 in the one brought by the corporate plaintiff.

Answers in each of the cases relied on a breach of a relied on implied warranty in each of the contracts that the article sold should at least correspond with and come within the commercial classification of the one purchased, and that the article with which both plaintiffs proposed to fill their contracts did not do so and it was of no commercial value whatever. Another paragraph sought, by way of counterclaim, to recover $500.00 from each plaintiff as damages sustained by defendant for their failure to comply with their contracts because, as defendant alleged, the market value of the unground garbage tankage purchased by it increased from $8.00 per ton to $8.50 per ton, and that it lost such increase in price because of plaintiffs' failure to comply with their contracts. Appropriate pleadings made the issues and the cases were tried together resulting in a verdict in each case denying plaintiffs' right to recover any sum, but finding in favor of defendant against each plaintiff the sum of $500.00, upon which judgment was rendered, and the court declining to set it aside on a motion for a new trial plaintiffs prosecute these appeals.

Learned counsel for appellants relies on and discusses with much vigor many supposed reasons wherein, according to his opinion, the judgments are erroneous and should be set aside, but it would serve no useful purpose either to the parties or to the profession to discuss *seriatim* the various questions raised and vigorously pressed, since, according to our view, the decisive ques-

tion in the cases is, what particular commercial article did the defendant purchase and plaintiffs sell under the respective contracts? The product agreed to be purchased and agreed to be sold, under the contracts, as expressed therein, was ''City of Chicago unground garbage tankage'' in the Downey contract, and ''City of Chicago. production unground garbage tankage'' in the contract with the corporate plaintiff. It is the contention of defendant that the sample shipments did not come within those classifications and that the shipped article, from which the entire contracts were proposed to be filled, was purely worthless rubbish and of no, or practically no, market value; while plaintiffs make a contrary contention. The evidence upon that issue was that some time in the year 1916 on vacant premises owned by the city of ·Chicago the collectors of garbage from kitchens of residences in the city began to dump the collected garbage and in the same condition as when taken from the garbage cans and continued to do so up to the time of the making of the contracts sued on; that with some kind of machinery, either owned by others or by the city, the pile of garbage which was on the ground and uncovered, was subjected to a treatment by which it was degreased and in that condition it was either placed back in the same pile or in another one where it remained in the same exposed condition, and it was from that pile that the sample shipments were made and from which plaintiffs claim the right to fill the entire contract.

Garbage of the kind involved here, when properly prepared, according to the evidence, is brought to the state that it becomes what is known to commercial fertilizers as ''tankage,'' and when tankage is thus made it is called ''garbage tankage.'' It may be ground or unground, the latter commanding a less price on the market than the former. So that, the essential point of inquiry in these cases was, what did the parties mean by designating the commodity in the contracts as ''unground garbage tankage'' or what did that description include, and the inquiry might be extended to what they meant by the ''City of Chicago unground garbage tankage?'' The proof is overwhelming (though there is some to the contrary) that by the term ''unground garbage tankage'' is not only meant that the tankage is unground and is composed of garbage, but that in order to become the designated commercial article or product it should not only be degreased but also have extracted from it ·all

foreign material such as tin cans, bottles, shoe soles, corks, pieces of wood and other foreign matter having no intrinsic value as a fertilizer product and which must always be done before the unground tankage can be ground in machinery manufactured for that purpose. The extracting of those foreign articles is partially done by a process of screening through a one-inch mesh and completed with the use of a magnet to take therefrom all foreign metallic substances. It is then dried to a certain degree of moisture and kept in that condition unexposed until sold. If that was the article in which the parties dealt in the two contracts sued on, then it is perfectly ' clear that plaintiffs neither attempted nor proposed to furnish it in fulfillment of their contracts. The court submitted that issue to the jury in an appropriate instruction, of which no serious complaint is made, and by its verdict it necessarily found that the classified commodity involved in the contracts was such as is above described, which finding, as we have seen, was supported by the overwhelming weight of the testimony, and we are therefore not authorized to disturb it.

But it is insisted that in the questions propounded to some of the witnesses they were asked what constituted, as commercially understood, "unground garbage tankage" without the qualification of the words "Chicago" or "City of Chicago," so as to enable and to require the witness to answer as to the composition of "Chicago unground garbage tankage" or "City of Chicago unground garbage tankage." If the evidence was such as to show that the qualifying words designated a different commercial product than what was included in the general description of "unground garbage tankage" there would be some force in this objection, since each contract dealt with unground garbage tankage with the descriptive words "Chicago" in the one and "City of Chicago" in the other. But the evidence was equally preponderant that those descriptive words filled no other office than to designate the city within which the garbage was collected and possessed no differentiating effect as to the description of the commercial article known as unground tankage; and that frequently the garbage from which the tankage is made was designated or described by giving the name of the city wherein it was collected, and that such locating words had no further effect than the one indicated, and this question was likewise taken care of in the instructions.

It is vigorously insisted that, since the contract not only did not contain an express warranty, but expressly declined to warrant, there should have been a peremptory instruction in favor of plaintiffs on the issue as to the character of commodity proposed to be furnished in fulfillment of the contracts. If the article actually shipped and proposed to be shipped in fulfillment of the contracts was of the character and description above given of "unground garbage tankage" there would be much force in this contention although it was inferior in quality. However, there is no complaint in this case about the quality, but the entire defense rests upon the contention that plaintiffs proposed to ship in fulfillment of the contracts an entirely different article from that purchased; and it is everywhere the law that one may not comply with his contract in selling a sawmill by description by furnishing to the purchaser a sewing machine, or perform a similarly obtained contract for the sale of an overcoat by delivering or offering to deliver an umbrella. He would be required, in the illustrations, under an implied warranty to furnish the kind of article sold, and to ship to his purchaser a sawmill or overcoat, howsoever inferior in quality they might be. 35 Cyc. 401-2, and 24 R. C. L. 171-2, paragraph 445, and cases in note 19. It is also the law that in the absence of a stipulation to the contrary, there will be an implied warranty that the described article, where the sale was made by description, as it was here, is reasonably suitable for the purposes for which it was bought, but the contracts here involved relieved plaintiffs from the obligations incurred by any such warranty, but did not relieve them from the implied warranty that the article sold was of the particular commercial kind or character which its description indicated.

Much complaint is made about the introduction of incompetent evidence and the rejection of supposedly competent evidence, but those objections relate to collateral matters, and even were we to hold that they were meritorious as to such collateral issues none of it could, and necessarily did not, influence or affect the jury in finding the materially essential issue in defendant's favor.

Lastly, it is contended that the verdict in favor of plaintiff for the sum of $500.00 in each case was erroneous because it allowed the recovery of 50 cents per ton, as representing the increased market value of the product over and above the contract price on the entire

amount of both purchases when plaintiffs did furnish in the Downey case 174 tons and in the other case 47 tons, upon which amounts plaintiff should not recover damages, and we think this contention is supported by the record. It does not necessarily follow, however, that the entire judgment should be set aside and a new trial be had of the whole case for those comparatively insignificant errors, since we are inclined to the belief that the allowance of damages to plaintiffs for the quantities of the articles shipped under the contracts was the result more of a clerical error than otherwise and may be corrected on a return of the cases by crediting the judgment against Downey with $87.00 and the one against Proto-Feed and Guano Company with $24.00, representing fifty cents per ton on the quantity of the articles shipped by each of them and that thereby substantial justice will be done the parties. The instructions relative to the counterclaim authorized the jury to make such credits and we are convinced that it was clearly an oversight on its part that it was not done.

Wherefore, the judgments are each affirmed, but with the direction to make the credits on them as above indicated.