Argued February 9; reversed February 28;
rehearing denied March 28, 1933

# ROCKWOOD & CO. *v.* PARROTT & CO.

## (19 P. (2d) 423)

*Ralph H. King,* of Portland (McCamant, Thompson & King, of Portland, on the brief), for appellant.

*Isham N. Smith,* of Portland (Robert N. Munly and W. A. Munly, both of Portland, on the brief), for respondent.

KELLY, J. Plaintiff is a Delaware corporation with its principal office and place of business in the city of New York, and engaged in the manufacture of cocoa and other products of cocoa beans, including cocoa cake manufactured from cocoa beans.

Defendant is a California corporation with an office and place of business at Portland, Oregon, and engaged in the sale of food stuffs and food products for human consumption.

Barclay, Brown & Jones is a Massachusetts corporation with its principal office and place of business at Boston, and engaged in business as merchandise brokers.

On October 27, 1927, defendant telegraphed from Portland, Oregon, to Barclay, Brown & Jones, Boston, as follows:

"Wire quotation two hundred tons cocoa cake packed in heavy bags one hundred tons for immediate shipment balance sixty days Advise name of seller and fat content Wire answer".

On October 29, 1927, Barclay, Brown & Jones, wrote to plaintiff as follows:

"We have inquiry today for a quantity of cocoa cake, packed in heavy bags; 100 tons for immediate shipment, the balance for 60 days shipment. The party making the inquiry requests information as to the fat content. We understand you are manufacturers of this item, it being a by-product in the manufacture of cocoa butter. If you can quote us a price on this, wire us on receipt of this letter your best price, fat content and brokerage to us".

On October 31, 1927, plaintiff wrote Barclay, Brown & Jones, declining to quote on any whole grade cocoa cake, but further stating as follows:

"We shall probably produce some lower grade cake which we would not guarantee as pure cake but with a fat content between 8 and 10 per cent. Just how much we will manufacture we do not know and in any event we would guarantee neither the quality nor the fat content. The goods would have to be purchased as delivered. We estimate that we may produce somewhere between 100 and 200 tons of these goods. We have made quotations in other directions subject to prior sale and our own right to withdraw prices quoted without notice. The price which we have quoted is $37 per ton of 2,000 lbs., gross for net, f. o. b. cars Brooklyn or f. a. s. steamer New York subject to our approval of delivery point, terms net cash ten days and brokerage of 5 per cent. Should you feel that this proposition would interest your customer in anywise we would be pleased to hear further from you. In the meantime we regret that we cannot quote on the item which you desire and thank you for your inquiry".

On November 2, 1927, Barclay, Brown & Jones telegraphed defendant as follows:

"Offer subject confirmation account large New York house about two hundred tons cocoa cake neither quality nor fat content guaranteed but which described eight ten per cent shipment as produced thirtyseven dollars ton gross for net fas steamer New York net cash ten days brokerage two half".

On November 2, 1927, defendant telegraphed Barclay, Brown & Jones:

"Accept both lots cocoa cake prices quoted subject approval samples by express Rush samples If samples satisfactory will wire shipping instructions immediately".

On November 3, 1927, Barclay, Brown & Jones telegraphed to plaintiff:

"Sold Parrott and Company Portland Oregon entire quantity cocoa cake your letter thirtyfirst subject buyers approval representative sample sent immediately We will give shipping instructions promptly when sample approved Wire confirmation".

On November 3, 1927, plaintiff wrote a letter to Barclay, Brown & Jones referring to said broker's letter of October 29, 1927, and plaintiff's answer thereto, acknowledging receipt of telegram last above quoted, and saying further:

"Today, we had telephone conversation with you and tried to set forth one or two matters which we thought would be of interest. Meantime, we beg to advise you as follows:

"We have instructed the foreman in our pressing department to gather samples within the coming 28 hours. The samples to be as representative as possible of the quality of the material which we are at the present moment producing. We shall hope by late afternoon, Friday, the 4th to have about 25 lbs. which we believe will be as representative as it is possible to get such a small sample, and this sample we shall plan to send forward by express to Messrs. Parrott & Co. We presume that it will be considerable time before they receive this sample, and when they have had opportunity for examining same, we shall hope that we may have some word through your good selves as to their decision in the matter.

"Meantime, we would advise that as we estimate things at present, we shall be producing 7,000 lbs. of this material per day over the balance of the year, unless the unforeseen takes place.

"In the meantime, we wish to confirm sale to Messrs. Parrott & Co. through you of 200 tons of 2,000 lbs. each, gross for net, weight of bags included, of material approximating in quality—sample which we are forwarding which we will in no wise guarantee as

to quality or uniformity, but which for all purposes under consideration, will not run much less than 7 per cent or scarcely higher than 10 per cent. This material is to be packed in second-hand cocoa bean bags, approximately 175 lbs. to the bag for shipment as fast as we produce same. The price being quoted f o b cars Brooklyn or f. a. s. steamer, New York, shipping point subject to our approval, and destination point subject to our approval, although on the face of our investigation of Messrs. Parrott & Co. we are led to believe that we should be quite pleased to accept order coming from them.

"It is understood that the goods are sold on the terms—net cash 10 days from date of shipment, (and we reserve 5 per cent brokerage for your good selves.) Needless to say, we should endeavor to get shipment off as nearly as possible to instructions issued by buyer and we have no reason to believe that our product will not approximate the figure mentioned above, and that the quality will not approximate the sampe which we shall send forward, both as to fat content, color, fineness, etc. and general quality—but inasmuch as the product is manufactured from various by-products, we are in no wise willing to guarantee any of the above. As a reputable manufacturer doing business in a large way, we could not, in all fairness to ourselves or to buyer, place any guarantees, but we wish to assure you that we look at the matter from a practical standpoint and we believe that the goods will, within all reason, conform to the quality of sample, but we do distinctly want it understood that under no circumstances, will we issue any guarantee in the matter. It is understood that these goods would be sold at price of $37 per ton —terms and other conditions as above.

"We shall send forward duplicate copy of this letter to you in case you should care to get forward same to Messrs. Parrott & Co. by air mail. Meantime, as regards length of time which it will take for Messrs. Parrott & Co. to make decision in this matter, we feel quite certain that if goods are sent forward on Friday, the 4th, by express, they should be in hand of the party

not later than noon, Saturday, Nov. 12th and we should expect to have answer from these people not later than noon, Wednesday, Nov. 16th.

"We shall therefore hold the proposition open until that date unless otherwise advised, and for any further time, we would have to extend special privilege.

"All the above must seem extremely cautious to you but we have had many experiences along the line of selling this type of material to Far West points through the agency of brokers and we do not wish to enter into a snarl. We are acting in good faith and feel certain that both you your good selves, and Messrs. Parrott & Co. are doing likewise.

"We do not want to have anybody stuck or disappointed and we do not want to have either of the above happen to us. We are trying to put things as plainly as possible before you and believe that you will appreciate this attitude on our end.

"We can say we have shipped a good many thousand tons of this material to one manufacturer to his great satisfaction and we have shipped hundreds of tons in other directions satisfactorily. We have also had a few disappointments, and a few have been disappointed by us, but in the main it has been because such buyers have not known the nature of the material and have been unwilling to read closely specifications which we have set forth as approximating quality, all of which naturally go without any guarantee.

"Trusting that we may have the pleasure of doing some business in this matter—and we shall await with much interest further word from your good selves, we beg to remain,

"Yours very truly,
"Rockwood & Co.
"————, Vice President."

A copy of plaintiff's letter of November 3, 1927, to Barclay, Brown & Jones, from which the foregoing quotation is taken, was forwarded by said broker to defendant, and plaintiff was notified of that fact.

A twenty-five pound sample of the press cake was sent to defendant by plaintiff.

On November 10, 1927, defendant telegraphed Barclay, Brown & Jones acceptance of ''one hundred tons Rockwood cake subject conditions outlined their letter November third''.

On November 11, 1927, this order by defendant of one hundred tons was by plaintiff accepted.

On November 14, 1927, plaintiff telegraphed Barclay, Brown & Jones:

''Important you advise us immediately regarding Parrot Billings stop if they intend to use for human consumption it must be billed as press cake stop if for cattle feed or other purposes may be billed as cocoa waste stop important account shipping rate to Parrot stop advise definitely also their address''.

Barclay, Brown & Jones telegraphed defendant:

''Wire fast day whether cake used human consumption or otherwise''.

Defendant telegraphed Barclay, Brown & Jones:

''Replying your telegram cocoa cake wanted for human consumption''.

And on said November 13, 1927, Barclay, Brown & Jones telegraphed plaintiff:

''Replying ship and invoice direct Parott and Company Lewis Building Portland Buyer advises goods will be used for human consumption''.

On November 15, 1927, plaintiff by letter to Barclay, Brown & Jones, among other things, say:

''We have your wire today advising us to ship the 25 tons of press cake for Parrot & Co. directly to them at Lewis Building, Portland, Ore. We note that the goods are to be used for human consumption and it will therefore be necessary for us to invoice these

goods to Parrot & Company as cocoa press cake which will as far as we are able to ascertain take a rate of $1.10 per hundred pounds''.

From the correspondence above mentioned, the character of the first contract between the plaintiff and defendant must be determined. That contract, though not in suit, is important because all three contracts in suit contain the clause, "Quality to average the same as previous contract''. It is clear that the previous contract thus mentioned is the one which is evidenced by said correspondence. After fifty tons of the cocoa product had been delivered pursuant to the first contract in suit, defendant refused to accept any further deliveries. Plaintiff recovered the difference between the contract price and the amount alleged to have been obtained by resale of the undelivered product.

Defendant claims that there was an implied warranty that the goods sold were suitable for human consumption, and also an implied warranty that said goods were merchantable; and that these implied warranties were breached.

Plaintiff insists that there was such a disclaimer of warranty as to preclude any implied or express warranty.

Section 64-315, Oregon Code 1930, provides:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether

he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer· or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.  *  *  *"

In the absence of anything to the contrary, reliance, by defendant, upon the skill and judgment of plaintiff and the direct statement that the commodity was being purchased for human consumption communicated to plaintiff, before any part of the commodity in suit had been delivered or any payment made thereon, would create an implied warranty of suitability and fitness for the avowed purpose for which it was being purchased.

We are therefore called upon to decide whether plaintiff's refusal to guarantee the product in question constitutes such a disclaimer of warranty as to preclude defendant from asserting an alleged breach of implied warranty as a defense herein.  Defendant argues that because the language of plaintiff's disclaimer of warranty does not expressly include the term, implied warranty, it fails to negative those warranties arising by implication of law.

Upon this point, defendant cites the case of *Bekkevold v. Potts,* 173 Minn. 87 (216 N. W. 790, 59 A. L. R. 1164). There, the disclaimer consisted of the statement

"no warranties have been made * * * by the seller to the buyer * * * unless written hereon". None were written thereon. The court held that the parties intended to say that no contractual warranties had been made; that the seller had not spoken or written any warranty in reference to the outfit.

Defendant also cites *Hooven & Allison Co. v. Wirtz*, 15 N. D. 447 (107 N. W. 1078). There, the court say:

"The testimony offered to establish the implied warranties which are declared in the above section, [Section 3978, Rev. Codes 1899] was apparently excluded upon the ground that it contradicted the terms of the written order. This was error. There is no conflict between the order and the implied warranties. The order does not state that the sale is made without warranties, neither does it state that the vendor warrants only against certain defects, thus excluding all other warranties, whether express or implied, as was the case in Dowagiac Mfg. Co. v. Mahon & Robinson, 13 N. D. 516, 101 N. W. 903. The order is silent upon the subject of warranties, save that it provides in effect that express warranties will not be recognized unless approved by the plaintiff in writing".

The case of *Colt Company v. Bridges*, 162 Ga. 154 (132 S. E. 889), also cited by defendant, is one wherein the written contract of purchase provides that "this instrument * * * covers all the agreements between the purchaser and the company, and that the contract cannot be altered or modified by any agent of the company, or in any manner, except by agreement in writing between the purchaser and the company acting by one of its officers". The court held that the assertion of the implied warranty did not in any way conflict with the stipulation in the written contract of sale that the instrument contains all the agreements of the parties. *Little v. VanSyckle*, 115 Mich. 480 (73 N. W.

554), is to the same effect as the case last cited. *Minneapolis S. & M. Co. v. Casey Land Agency*, 51 N. D. 832 (201 N. W. 172), follows the doctrine of the two cases last cited and holds that the express warranty given by the seller did not restrict the remedy for breach of the implied warranty.

*Downey v. Price Chemical Company*, 204 Ky. 98 (263 S. W. 690), also cited by defendant, is a case wherein the court held that a statement in the contract, that "no guaranty of any kind given", did not preclude recovery for failure to furnish the kind of article sold. The following quotation clearly distinguishes that case from the case at bar:

"It is also the law, that in the absence of a stipulation to the contrary, there will be an implied warranty that the described article, where the sale was made by description, as it was here, is reasonably suitable for the purposes for which it was bought; but the contracts here involved relieved plaintiffs from the obligations incurred by any such warranty, but did not relieve them from the implied warranty that the article sold was of the particular commercial kind or character which its description indicated".

■ It will be noted that the only one of the above cited cases which construed a statement in the contract of sale similar to that contained in plaintiff's letter of November 3, 1927, to the effect that there is no guaranty of any kind expressly holds that such a stipulation relieves plaintiff from the obligations of an implied warranty that the article sold is reasonably suitable for the purposes for which it was bought. We are convinced that this is a correct statement of the law. *Potter v. Shields*, 174 Mich. 121 (140 N. W. 500); *Fruit Dispatch Co. v. C. C. Taft Co.*, 197 Iowa 409 (197 N. W. 302); *Seefus v. DeVaughn*, 108 Neb. 628 (188 N. W. 235); *Leonard Seed Co. v. Crary Canning Co.*, 147

Wis. 166 (132 N. W. 902, 37 L. R. A. (N. S.) 79, Ann. Cas. 1912D, 1077); *W. F. Dollen & Sons v. Carl R. Miller Tractor Co.,* 241 N. W. 307; *Tamkin v. Nelson-Dowling Coal Co.,* 82 N. H. 96 (130 Atl. 26); *Smith v. Bank of State* Riley Ch. (S. C.) 152; *Habersham v. Rodrigues,* 1 Speers (S. C.) 314; *Farr v. Gist,* 1 Rich. L. (S. C.) 68; *Boinest v. Leignez,* 2 Rich. L. (S. C.) 464; *Monroe v. Hickox, Etc.,* 144 Mich. 30 (107 N. W. 719, 13 Detroit Leg. N. 123); *Jones v. George S. Riley Jr. Co.,* 14 Ga. App. 84 (80 S. E. 341); *Burntisland Shipbuilding Co. v. Barde Steel Products Corp.,* 278 Fed. 552; *Barrineau v. Holman,* 19 Ga. App. 511 (91 S. E. 921); *Harrell v. Holman,* 21 Ga. App. 159 (93 S. E. 1021); *Sommerville v. Gullett Gin Co.,* 137 Tenn. 509 (194 S. W. 576); *Crampton v. Lamonda,* 95 Vt. 160 (114 Atl. 42); *Couts v. Sperry Flour Co.,* 85 Cal. App. 156 (259 P. 108); *Hartin Commission Co. v. Pelt,* 76 Ark. 177 (88 S. W. 929).

There are cases announcing a contrary doctrine. *Hall Furniture Co. v. Crane Mfg. Co.,* 169 N. C. 41 (85 S. E. 35, L. R. A. 1915E, 428); *National Seed Co. v. Leavell,* 202 Ky. 438 (259 S. W. 1035); *Hobdy and Read v. Siddens,* 198 Ky. 195 (248 S. W. 505); *Morris Run Coal Co. v. Carthage Sulphite Pulp & Paper Co.,* 210 App. Div. 678 (206 N. Y. S. 676); Affirmed 242 N. Y. 567 (152 N. E. 430); *Swift v. Etheridge,* 190 N. C. 162 (129 S. E. 453); *Prentice v. Fargo,* 53 App. Div. 608 (65 N. Y. S. 1114).

The question is interestingly treated and the authorities collated in an article entitled: "Effect of Non-Warranty Clauses in Sales Contract", appearing in the December, 1921, issue of the Columbia Law Review, Vol. XXI, No. 8, p. 1325.

A brief discussion thereof is also to be found in Vol. 42, Harvard Law Review, p. 710, and 27 Michigan

Law Review, p. 592. See also 37 L. R. A. (N. S.) 79, 82; 25 Ann. Cas. 1079; 12 A. L. R. 880; 32 A. L. R. 1244.

Defendant accepted 150 tons of the material and through its undisclosed principal, Mr. Polsky, manufactured most of it into marketable products. In March, 1928, Mr. Polsky caused a chemical analysis to be made of the product and received a report thereupon. It was not until sometime in September, 1928, that defendant refused to accept further delivery. In the meantime Mr. Polsky was causing experiments to be made with various grinding and separating machines with a view of continuing to manufacture the product made from the commodity in suit. This tends to disclose that defendant relied upon Polsky's judgment and that Polsky relied upon the manufacturers and designers of the grinding and separating machines to supply him with equipment which would separate the pure cocoa from the insoluble ash, etc., and thereby enable him to produce an article which would comply with the pure food law.

If there is no warranty of fitness for a particular purpose, the buyer cannot claim more than that the goods with their defects known shall be salable as goods of the general kind which they were described or supposed to be when bought. 1 Williston on Sales (2d Ed.) 486, § 243. There is nothing in the record tending to show that the press cake in suit was not salable. Plaintiff claims to have sold it after defendant refused to accept deliveries thereof, and defendant suggests that it has not been shown that the amount alleged to have been derived by plaintiff upon such sale was equal to its actual value. The learned trial judge did not err when he declined to submit to the jury the question of whether there were implied warranties of suitability and merchantability.

■■ Defendant urges that the amount of plaintiff's damages, if any, should not have been determined by the court, but by the jury, if at all. In this we concur. While we do not intimate any lack of veracity on the part of plaintiff's witnesses, who testified concerning the alleged resale of the commodity by plaintiff, yet, it appears that these witnesses did not conduct that transaction and knew only what is shown by the correspondence, written contracts and entries on plaintiff's books of account. The failure to offer the testimony of the person who conducted the sale, either by taking his deposition or calling him as a witness, raises a presumption that his testimony, if given, would be adverse. Moreover, reasonable minds may well differ as to the inference to be drawn from the condition reflected in plaintiff's letters, disclosing a demand for the product in question only a few months before the resale, which justified even a higher price for it than the price fixed by the contract in suit. So, too, of the statement in plaintiff's letter of November 3, 1927, to the effect that a good many thousand tons of this material had been shipped to one manufacturer to his great satisfaction, and hundreds of tons to others.

The judgment of the circuit court is reversed and the cause remanded for further proceedings not inconsistent herewith.

RAND, C. J., BELT and ROSSMAN, JJ., concur.