[Civ. No. 16306. First Dist., Div. One. Sept. 27, 1955.]

LEWIS B. COLLUM et al., Appellants, v. POPE AND TALBOT, INC. (a Corporation) et al., Respondents.

Johnson, Thorne, Speed & Bamford for Appellants.

Lillick, Geary, Olson, Adams & Charles, Allan E. Charles, Frank L. Adamson, Campbell, Custer, Warburton & Britton, Austen D. Warburton and W. R. Dunn for Respondents.

WOOD (Fred B.), J.—Plaintiffs, journeymen carpenters working on a construction job, were injured when a ceiling joist broke under their weight. They brought this action for damages against Leo G. Cheim, the lumber dealer from whom their employer W. R. Kalsched, the general contractor, bought the joist, and against Pope and Talbot, Inc., the lumber mill operator who processed the joist and sold it to Cheim.

The principal question upon this appeal is whether or not the trial court committed error when it ordered a nonsuit in respect to those counts of the complaint which were predicated upon an alleged breach of warranty of fitness.

There was no privity of contract between the plaintiffs and the defendants, but this particular joist, which was of Douglas fir, bore the stamp "Pope & Talbot Co. (WCLB) No. 1," which signified that it was Douglas fir, grade No. 1. The grading was done at Pope and Talbot's mill by an employee of the West Coast Lumbermen's Association, of which Pope and Talbot was a member. This label, thus affixed, furnishes the basis of plaintiffs' claim that Pope and Talbot as manufacturer and Cheim as dealer warranted the quality of this joist for their benefit and that they acted in reliance thereon to their injury.

To make out an *express* warranty, plaintiffs invoke certain statements in a handbook of "Standard Grading and Dressing Rules" issued by the association that did the grading. In it, plaintiffs find described the "characteristics and limiting provisions" of Douglas fir, grade 1, and tables of "specific minimum strength values" for various grades of lumber, including this grade. They invoke the stated "purpose" and "object"[1] of these grading rules as indicative of an intent to warrant to the trade and the public that any piece of lumber

---

[1] The handbook states that the "purpose of West Coast grade mark is to identify to the consumer the quality of lumber received. It is applied only by a West Coast Inspector or at a licensed operation whose grading practices are under supervision of the West Coast Bureau of Lumber Grades and Inspection. Grade marking is restricted to standard yard grades of West Coast lumber graded under Standard Rules of the West Coast Bureau of Lumber Grades and Inspection''; that the ''object of grading rules is to establish a basis of quality that will equalize, as nearly as possible, the characteristics of a species in such a manner as to produce grades of relative quality, and so develop as to be best adapted to the principal purposes for which the species is used'' (§ 1); that ''STRESS GRADES are designed to meet exacting structural requirements and to assure the engineer of specific minimum strength values'' (§ 200); and that ''these stresses are in conformity with National Design Specifications and are for designs made and carried out under competent supervision for lumber of assured stress grade'' (§ 200).

bearing the association's grading stamp will have the minimum strength specified for that grade in the handbook.

But the handbook also declares that this inspection is a visual determination of the quality of the lumber, that there is variation of opinion between inspectors, that a variation of 5 per cent is reasonable and that a tolerance of 5 per cent has been adopted as standard practice.[2] In addition, the handbook declares, the grade as determined by the inspector applies only to the condition of the lumber at time of original inspection.[3]

Provision is made in the handbook for the settlement of complaints in a certain manner. This includes reinspection by the association's inspection bureau. The buyer must file his complaint with the seller within 10 days from the receipt of the lumber. He must hold the disputed material intact, properly protected, for not exceeding 30 days after date of request for inspection or reinspection. "The contractual obligation of the seller shall be deemed to have been fulfilled if each item in a carload or a cargo lot shall, upon reinspection under the grading and inspection rules under which the lumber has been graded and sold, be found to be 95% or more of said grade or better, the material below said grade to be accepted by the buyer as of its actual grade. When the degrades are in excess of 5% of such item, or when the degrades are found upon reinspection to be more than one grade lower than the grade invoiced, the degrades shall be the property of the seller." (§ 18.)

These provisions token an intent to make the grade representations to the immediate buyer only and to limit him to rejection of mislabeled boards if the 5 per cent tolerance is exceeded, and then only if he complains promptly and holds the material available for reinspection for a reasonable period. That does not suggest an intent to guarantee the strength and the fitness of the material.

Plaintiffs cannot very well reject or ignore those statements

---

[2] "The inspection of lumber is a visual determination of the quality of the product. In the visual application of the Characteristics and Limiting Provisons of a grade, there will naturally be some variation of opinion between inspectors. Experience has proven that a variation of 5% as between inspectors is a reasonable variation, and this tolerance has been adopted as standard practice in the lumber industry." (§ 2.)

[3] "The grade of lumber, as determined by the inspector, applies to the size, form, condition or seasoning at time of original inspection; any subsequent change in the lumber must be disregarded in determining the accuracy of original inspection." (§ 2.)

in the handbook that are unfavorable to their theory while invoking those that might tend to support their contention that they are beneficiaries of an express warranty. The unfavorable statements are not in the nature of secret or hidden disclaimers. They have equal prominence in the handbook with the provisions which plaintiffs invoke. Both types are integral parts of the whole. Read together, as they must be, they do not furnish a basis for the asserted express warranty.

But even without those qualifying and limiting statements in the handbook the lack of privity of contract would be fatal to plaintiffs' claims, whether based upon express or upon implied warranty.

Plaintiffs seek to bring themselves within one or the other or both of two exceptions to the privity of contract rule, noted by our Supreme Court as recently as April, 1954:

"The general rule is that privity of contract is required in an action for breach of either express or implied warranty and that there is no privity between the original seller and a subsequent purchaser who is in no way a party to the original sale. (See *Lewis* v. *Terry,* 111 Cal. 39, 44 [43 P. 398, 52 Am.St.Rep. 146, 31 L.R.A. 220] ; *Cliff* v. *California Spray Chemical Co.,* 83 Cal.App. 424, 430 [257 P. 99] ; 1 Williston on Sales [rev. ed. 1948] § 244, pp. 645-648; 46 Am.Jur. 489-490; 17 A.L.R. 672, 709; 140 A.L.R. 192, 249-250.) In this state an exception to the requirement of privity has been made in cases involving foodstuffs, where it is held that an implied warranty of fitness for human consumption runs from the manufacturer to the ultimate consumer regardless of privity of contract. (*Klein* v. *Duchess Sandwich Co.,* 14 Cal.2d 272 [93 P.2d 799] ; *Vaccarezza* v. *Sanguinetti,* 71 Cal. App.2d 687, 689 [163 P.2d 470].) Another possible exception to the general rule is found in a few cases where the purchaser of a product relied on representations made by the manufacturer in labels or advertising material, and recovery from the manufacturer was allowed on the theory of express warranty without a showing of privity. (See *Free* v. *Sluss,* 87 Cal.App. 2d Supp. 933, 936-937 [197 P.2d 854] [soap package contained printed guarantee of quality] ; *Bahlman* v. *Hudson Motor Car Co.,* 290 Mich. 683 [288 N.W. 309, 312-313] [automobile manufacturer represented top of car to be made of seamless steel] ; *Baxter* v. *Ford Motor Co.,* 168 Wash. 456 [12 P.2d 409, 15 P.2d 1118, 88 A.L.R. 521] [automobile manufacturer represented windshield to be nonshatterable glass] ; *Simpson* v. *American Oil Co.,* 217 N.C. 542 [8 S.E.2d 813, 815-816] [repre-

sentation on label that insecticide was nonpoisonous to humans]; Prosser on Torts [1941] 688-693; 1 Williston on Sales [rev. ed. 1948] 648-650; Feezer, *'Manufacturer's Liability for Injuries Caused by His Product,'* 37 Mich.L.Rev. 1; Jeanblanc, *'Manufacturer's Liability to Persons Other than Their Immediate Vendees,'* 24 Va.L.Rev. 134, 146-155.)'' (*Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 695-696 [268 P.2d 1041].)[4]

Plaintiffs claim that the trend of decision in the last 25 years had been to extend the foodstuffs exception to include any ''defectively manufactured product of industry which causes bodily injuries'' and that the other exception is not necessarily limited to the ''purchaser'' but should be regarded as including the ultimate consumer.

Before we consider any extension of these exceptions it is desirable that we carefully consider their true nature and scope. Each has to do with a product which has been put together, manufactured, assembled, fabricated, and marketed in such a fashion that it does not admit of ready inspection and contains deleterious or defective ingredients which render it unfit for the use for which expressly or impliedly warranted. The foodstuff cases have usually involved prepared foodstuffs (such as cake, sandwiches, flour) marketed in the original containers, rendered unfit by some foreign substance (such as a needle, arsenate of lead, or maggots) incorporated as an ingredient during the process of manufacture. These factors make it equitable to impose responsibility upon the ''manufacturer,'' who has control of the situation and can do something about it, for the protection of the ''ultimate consumer who, under modern economic conditions, almost of necessity, must purchase many items of food prepared in original packages by the manufacturer and intended for the consuming public, although marketed through an intermediate dealer.'' (*Klein* v. *Duchess Sandwich Co.*, 14 Cal.2d 272, 283 [93 P.2d 799]; cited in the Burr case as the leading authority in this state for the foodstuffs exception.)

The cases cited in the Burr case in support of the second exception (the express warranty exception) are similar in

---

[4]The facts of the Burr case (a claim of warranty of the quality of an insecticide which proved detrimental to the cotton plants to which applied) did not come within the exception relating to foodstuffs but the record contained sufficient evidence to show that there were representations which could form the basis of an express warranty within the scope of the second exception noted in the above quotation, and the cause was remanded for the trial of that issue. (Pp. 696-697 of 42 Cal.2d.)

character. For example, in *Bahlman* v. *Hudson Motor Car Co.* (1939), 290 Mich. 683 [288 N.W. 309], the manufacturer's literature represented that its auto had a seamless steel roof, "A steel top which is a smooth, solid unit with the body shell," whereas in fact it was of two pieces welded together at approximately above the driver's seat, with jagged edges along the seam, covered with a masonite lining which fell off when the car overturned, allowing plaintiff's head to strike those edges, to his serious injury. In holding the manufacturer liable despite the lack of privity of contract, the court relied heavily upon the earlier case of *Baxter* v. *Ford Motor Co.* (1932), 168 Wash. 456 [12 P.2d 409, 15 P.2d 1118, 88 A.L.R. 521], (likewise cited in the Burr case), in which the manufacturer was held to his express representation that the windshield of the car was of shatterproof glass " 'so made that it will not fly or shatter under the hardest impact' " and in which the court emphasized the fact that "an ordinary person would be unable to discover by the usual and customary examination of the automobile whether glass which would not fly or shatter was used in the windshield" (p. 412), likening it to a "wrongly labeled drug" (p. 412).

These significant factors we find clearly and cogently expressed by Justice Traynor in his concurring opinion in *Escola* v. *Coca Cola Bottling Co.*, 24 Cal.2d 453, 467-468 [150 P.2d 436] : "As handicrafts have been replaced by mass production with its great markets and transportation facilities, the close relationship between the producer and consumer of a product has been altered. Manufacturing processes, frequently valuable secrets, are ordinarily either inaccessible to or beyond the ken of the general public. The consumer no longer has means or skill enough to investigate for himself the soundness of a product, even when it is not contained in a sealed package, and his erstwhile vigilance has been lulled by the steady efforts of manufacturers to build up confidence by advertising and marketing devices such as trade-marks. [Citations.] Consumers no longer approach products warily but accept them on faith, relying on the reputation of the manufacturer or the trade-mark. [Citations.] Manufacturers have sought to justify that faith by increasingly high standards of inspection and a readiness to make good on defective products by way of replacements and refunds. [Citation.] The manufacturer's obligation to the consumer must keep pace with the changing relationship between them; it cannot be escaped because the marketing of a product has become

so complicated as to require one or more intermediaries. Certainly there is greater reason to impose liability on the manufacturer than on the retailer who is but a conduit of a product that he is not himself able to test. [Citations.]

"The manufacturer's liability should, of course, be defined in terms of the safety of the product in normal and proper use, and should not extend to injuries that cannot be traced to the product as it reached the market."

Such factors are lacking in the processing of lumber under the circumstnces which obtained in the instant case. The mill operator put no foreign, deleterious substance into this joist. He inserted nothing into it at all. Nor did he combine or cover it with any other substance. He merely took sections of a tree, a product of nature, and cut them to size. When it came onto the market, and into the hands of the dealer, the building contractor, and the journeyman carpenter, its qualities continued visible, equally as visible and as readily discernible as when it left the view of the inspector who graded it as it came from the planer at the mill. Thus, plaintiffs were in as good a position to determine the utility of this lumber as was the inspector at the mill. Indeed, they were in an even better position for in the process of cutting and fitting the joist, putting it in place and nailing it, they necessarily had it under observation a longer period and more minutely than the inspector at the mill, and as journeymen carpenters they doubtless know their lumber.

Not without significance is the absence of testimony based upon visual inspection, that this particular piece of Douglas fir was in fact of a lower grade than No. 1. Several experts testified that they would grade it at the top of grade No. 1 or better. Recognizing this fact, plaintiffs in their opening brief stated that "there was nothing about the board that would have placed plaintiffs on notice of any defect. And it was equally and unanimously agreed that, absent latent defects or mistreatment, the board would not have broken." Thus, it clearly appears that visual inspection, the only practical inspection available to the mill operator, would not disclose the defective qualities of this particular board, if it had any defects.

Another feature of this case additionally differentiates it from the implied warranty and express warranty exceptions mentioned in the Burr case. Plaintiffs are themselves manufacturers in the sense that they took this and other similar timbers, cut and fitted the ends of each and nailed them in

place to serve as ceiling joists. In the process they made signifiant changes.

These changes were made in response to the architect's specification that these ceiling joists rest on 2″ x 3″ ledgers laid along the edge of the supporting truss which ran at right angles to the joists. The cutting of these notches at either end of the joist reduced its width (its height above the ledger) from about 7⅛″ to about 4½″. This considerably reduced its cross-section area. In addition, the ends of this board, above these notches, were chiseled on the side a bit, apparently to avoid bolts which projected from the trusses at the points of contact with the joist. There was also evidence of hammer marks at the ends of the joist, upon its upper edge, apparently made when forcing it into place, and testimony that such blows tend to disrupt the layers of wood and develop a break or split.

In other words, these changes which plaintiffs made in this piece of lumber were such as would seem to make it inequitable for the law to treat it as the very same article which the millowner sold to the dealer and the dealer sold to the contractor, when the urge is to extend an exception to the rule which requires privity of contract. Any express warranty seems clearly precluded by these changes. The handbook of grading rules, as we have noted, expressly declares that the grading applies only to the "size, form, condition" at the time of original inspection or the time and point of original shipment and that "any subsequent change in manufacture or condition" will prohibit a reinspection for adjustment of claims except with the consent of all parties interested.

More fundamental, however, and pivotally significant, is the fact that the cutting of logs into boards of varying sizes is not "manufacturing" within the meaning of that word, or its variants, as used by our Supreme Court when in the Burr case it noted the two exceptions to the requirement of privity of contract. In view of this dissimilarity, we do not feel that we as an intermediate court of appeal should undertake to enunciate and declare the suggested extension of either of those exceptions.

Finally, plaintiffs contend that by analogy to sections 3852-3854 of the Labor Code, which allow the employer to sue a person who tortiously injuries one of his employees, plaintiffs herein should be allowed to stand in the shoes of their employer and enforce his putative right of action against the mill operator and the lumber dealer upon the asserted

contracts of warranty with him. There is no analogy. It is one thing to allow an employer who becomes obligated to pay workmen's compensation to recoup from a third party wrongdoer who caused the injury. It would be quite another thing to extend a man's contract to include third-party beneficiaries not mentioned or contemplated. Defendants' duties, if any, to respond in damages to the employer could not thus be made to inure to the benefit of the plaintiffs.

In view of this conclusion, there is no need to consider whether there was sufficient evidence to go to the jury on the question whether this joist was of lower grade than No. 1, whether plaintiffs acted in reliance upon the asserted representation that it was No. 1, or similar questions.

We find no abuse of discretion in the denial of plaintiffs' motion for a new trial. It involved a conflict of evidence, presented by affidavits of two members of the jury on the question whether or not one of them (in response to questions asked of her as a prospective juror) accurately and truly stated her attitude toward the bringing of an action of this kind. Our examination of the record convinces us that the trial court's resolution of that conflict is not subject to reversal by a reviewing court.

The judgment is affirmed. The appeals from the order granting defendants' motion for a nonsuit on the warranty counts and from the order denying plaintiffs' motion for a new trial are dismissed because such orders are nonappealable.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied October 27, 1955, and appellants' petition for a hearing by the Supreme Court was denied November 23, 1955. Carter, J., was of the opinion that the petition should be granted.