[Civ. No. 17191. First Dist., Div. One. Mar. 19, 1957.]

CHARLES E. MOORE et al., Plaintiffs, v. HUBBARD AND JOHNSON LUMBER COMPANY (a Corporation) et al., Respondents; B. B. BYARD et al., Appellants.

Pedder, Ferguson & Pedder for Appellants.

Ropers & Majeski for Respondents.

WOOD (Fred B.), J.—As stated by Honorable Edwin J. Owens, the trial judge, in an opinion which he wrote and filed, this is an action "commenced originally by the plaintiff Industrial Assets Company (a copartnership) against the firm of Buttress and McClellan (a corporation) and Hubbard and Johnson Lumber Company (a corporation). Subsequently the defendant Buttress and McClellan filed a cross-complaint for declaratory relief against Industrial Assets Company and Hubbard and Johnson. Still subsequently Hubbard and Johnson filed a cross-complaint against defendant Trinity River Lumber Company.

"The situation, as developed by the evidence is as follows: Industrial Assets Company entered into a project of building a large warehouse in San Jose to be leased to the American Can Company. With this in mind, contact was made with the firm of Buttress and McClellan, a large construction firm with offices in Los Angeles. As a result of preliminary negotiations a contract for the erection of the warehouse

was entered into between plaintiff Industrial Assets Company and defendant Buttress and McClellan. . . . Certain lumber was purchased from defendant Hubbard and Johnson. The lumber thus purchased was used in the construction of the roof, the lumber being covered on the outside by roofing material placed thereon by a roofing company. It developed subsequently that the lumber used on the northern half of the roof was infested by an insect known as 'Arhopalus productus Le Conte' also known as a 'longhorned beetle.' It is characteristic of this insect to eat its way out of the wood to the surface leaving behind it a hole in the wood. In this case the insects not only emerged from the lumber itself but ate their way also through the protective covering of roofing material, creating numerous holes in the portion of the roof referred to so that in rainy weather the water entered these holes and, finding its way to the seams between the boards, leaked into the warehouse itself. It became necessary therefore to effect frequent repairs upon this portion of the roof and, in order to prevent future damage through further emergence of the beetles, to replace that portion of the roof by replacing some of the lumber and recovering the northern half of the roof first with sheet metal over which a new coating of roofing material had to be placed. As a result the plaintiff, Industrial Assets Company, brought its suit to recover its cost of these repairs.''

Judgment was rendered against Trinity in favor of Hubbard and Johnson upon the latter's cross-complaint.

### The Issues

(1) Does the evidence support the finding that Trinity furnished the infested boards? (2) Did Trinity warrant the merchantability of the boards it furnished? (3) Did the court commit prejudicial errors in procedure during the course of the trial?

### The Sufficiency of the Evidence

The defect was latent. Visual inspection does not disclose the presence of the larvae. Their entrance holes are too small for detection by the eye. They may remain in the wood for some time before boring their way out, making much larger holes.

If Trinity had supplied all of the roof boards there would, of course, be no doubt that all of it came from its mill. However, Trinity supplied about two-thirds and another mill operator, Triangle Lumber Company, supplied about one-

third of the boards used. This posed the issue of tracing the infested boards to their source.

■ Trinity's lumber was marked near the end of each board: Its Number 1 grade, by the stamp of the West Coast Lumbermen's Association; its Number 2, by a blue crayon slash mark. A good many of these marks were removed in fabrication, by cutting the boards upwards of two feet from the end. The lumber supplied by Triangle was not marked.

There was evidence that infested boards and boards bearing the Number 1 stamp were in juxtaposition. Adjacent boards would have come from the same load of lumber. Each load was brought directly from the mill to the job and dumped in a single pile at the saw site. The ends of the boards in that pile would be tongue and grooved (the tongue and groove work at the mill stop a short distance from the end of each board) and taken on lumber carriers to the building, where it was put in place and nailed to the roof. There was no commingling of lumber received respectively from Trinity and from Triangle. There was also evidence that some of the boards in which holes had developed bore Trinity's Number 1 grade mark, and some bore Trinity's Number 2 blue slash marks.

Concerning this issue and his appraisal of the evidence, Judge Owens said: "The burden on Hubbard and Johnson is to establish that the infested lumber was purchased from Trinity Lumber Company. This burden, of course, requires Hubbard and Johnson to establish the fact by 'a preponderance of the evidence.' We are concerned with 'logical probability.' Does the evidence indicate that it is more probable that the infested lumber was Trinity lumber than that it was not Trinity lumber? To establish this probability Hubbard and Johnson rely upon five criteria, (1) accessibility of beetles to the wood, (2) the actual grade stamp of Trinity upon some of the infested wood, (3) the blue slash marks upon some of the infested wood, (4) the pattern of boards as identified in the portion of the roof where the holes were located and the leakage occurred, (5) the proportionate amount of total lumber which was supplied by Trinity.

"With respect to the first criterion, the evidence establishes that the type of beetle here involved lays its eggs in 'dead' wood and that when the beetle emerges from the wood subsequently it flies away to renew the process in other 'dead' wood. It is capable of flying several miles. One of

the more common causes of 'dead' wood is fire, that is a tree which, while still standing, has been attacked by fire. The evidence in this case shows that the lumber in question was taken from one side of the Trinity River while, on the other side of the river, the trees had been devastated by fire. The lumber in question was permitted to remain on the ground after the trees were cut long enough to render the timber 'dead' and thus a likely prey for beetles emerging from the fire-killed timber. Without analyzing in detail the evidence bearing upon the other four criteria, the court is of the opinion that Hubbard and Johnson have met the burden of establishing, by a 'preponderance of the evidence' that the infested lumber was purchased by Hubbard and Johnson from the Trinity Lumber Company.'' We concur in Judge Owens' analysis and conclusion on this phase of the inquiry.

## WARRANTY OF MERCHANTABILITY

The evidence supports the findings that lumber infested as this lumber was is not merchantable and that Trinity impliedly warranted that this lumber was merchantable.

■■ We concur in Judge Owens' exposition of the applicable principles of law: ''The second subdivision of Civil Code, 1735 provides for an implied warranty of merchantability in the case of a sale by description from a dealer who deals in such goods. (Civ. Code, § 1735, subd. (2).) In such a sale the goods are warranted to be of *merchantable quality*. This warranty is applicable even if buyer and seller possess equal skill and judgment where the defect is a *latent* defect.

''In the instant case the goods were purchased by description, viz., 2x6 Douglas fir tongue and groove, No. 1, with sixteen percent (16%) No. 2.'' Trinity is a seller who deals in goods of this description (see Civ. Code, § 1735, subd. (2)). ''In such a case there is implied the *warranty* that the goods be of *merchantable quality*. (Emphasis added.)

''The term 'merchantable quality' has been given a multitude of definitions. A very recent case from the California Supreme Court has given its definition of this term. The court said: '' 'Many definitions of ''merchantable quality'' have been given but all of them include the basic proposition that the quoted words refer to goods which are reasonably suitable for the ordinary uses and purposes of goods of the general type described by the terms of the sale and which are capable of passing in the market under the name

or description by which they are sold. (Citing authorities.) Hence it seems clear that the statutory warranty is sufficiently broad to impose liability . . . if the goods contain an impurity of such a nature as to render them unusable, and therefore unsaleable, for the general uses and purposes of goods of the kind described. *Burr* v. *Sherwin Williams Co.* (1954), 42 Cal.2d 682, 694 [268 P.2d 1041].'

"In this case the goods, i.e., the lumber, contained beetles embedded in them when sold. The presence of such beetles in the lumber is in the nature of a latent defect. In such a case the lumber could only be used for very limited purposes. Since this defect was hidden it was in the nature of a latent defect. Further, there was evidence that if such a defect were known the lumber would be discarded as not being either No. 1 or No. 2 lumber. In such a case the lumber would be *unusable* and *unsalable*. Applying the rationale of the Burr case, *supra*, such goods would not be merchantable. Further, it is usually stated that the goods must be such that with the defects *known* they would be salable as goods of the general kind which were described or supposed to be when bought. (*Kenney* v. *Grogan*, 17 Cal.App. 527, 533 [120 P. 433]; *Rockwood & Co.* v. *Parrott & Co.*, 142 Ore. 261 [19 P.2d 423] (Oregon); I Williston on Sales 486, § 243). As has been pointed out, if this defect were known they would not have been salable 'as goods of the general kind which were described.' They would not measure up to the description given by the purchaser, and hence would breach the implied warranty of merchantability.

"The mere fact that the defect was latent or hidden does not excuse the seller. Quite the contrary. The case of *Tremeroli* v. *Austin Trailer Equipment Co.* (1951), 102 Cal. App.2d 464 at 477 [227 P.2d 923] said: '. . . the substantial weight of authority is to the effect that, under the Uniform Sales Act, the implied warranty extends to latent defects. (Citing authority.) This appeals to us as sound law.' "

*Collum* v. *Pope & Talbot, Inc.*, 135 Cal.App.2d 653 [288 P.2d 75] invoked by Trinity, is inapplicable. In that case, in contrast to the present case, there was no privity of contract.

### PROCEDURAL POINTS

The trial judge took under submission Trinity's demurrer to the cross-complaint and proceeded with the taking of testimony at the trial. The next day he sustained the de-

murrer, with leave to amend. The parties then stipulated that Hubbard and Johnson would amend to state a cause of action for breach of warranty and that Trinity would answer thereto. In the course of their discussion counsel apparently turned this into a stipulation that such an amendment be deemed to have been filed by Hubbard and Johnson and denied by Trinity. At any rate, the trial proceeded just as if the issues that such pleadings would frame were before the court for decision. We find in that no basis for a reversal. The "demurrer" in question was a part of Trinity's answer. The day appointed for the commencement of the trial had arrived. The record does not disclose any objection made by Trinity to going ahead with the trial. Its counsel participated in the examination of witnesses that day. The point is without merit upon this appeal.

We do not find error in the permission granted Hubbard and Johnson to amend its cross-complaint from an action for reimbursement and indemnity to one for breach of warranty, a permission which was granted upon sustaining Trinity's demurrer. Trinity did not then nor does it now claim that the statute of limitations had run, which would be the only significant consequence if such an amendment were deemed the pleading of a new cause of action.

Next, Trinity says no further amended cross-complaint was filed and so, it says, Hubbard and Johnson had no pleading upon which the judgment in its favor could be based. One of the counts of the complaint in question pleaded breach of warranty. Hubbard and Johnson says in its brief that "both counsel agreed that the trial would continue without the filing of a cross-complaint," and we find in Trinity's closing brief no denial of that statement. Moreover, the trial proceeded just as if the indicated amendment, and Trinity's answer thereto, had been filed.

Nor do we perceive any abuse of discretion in the trying of the main action and this cross action at the same time. (Code Civ. Proc., § 1048.)

At the time of the trial, says Trinity, Hubbard and Johnson had sustained no damages, because its liability to the plaintiff had not yet been determined; therefore, its claim against Trinity was premature. That is a nonsequitur. An intermediate purchaser, such as Hubbard and Johnson, "may recover the amount for which he is liable to his subpurchaser [the plaintiff herein] . . . notwithstanding that the purchaser [Hubbard and Johnson] has not settled with the subpurchaser

or suffered judgment [citations]." (*Grupe* v. *Glick*, 26 Cal.2d 680, 690 [160 P.2d 823].)

Finally, Trinity asserts error in a correction which the trial judge made in the judgment as first filed. It originally awarded $29,094.07 to Hubbard and Johnson against Trinity "as reimbursement and indemnity." Later, the judge changed "indemnity" to "damages." This seems, quite clearly, the correction of a clerical error and thus well within the authority of the trial judge to make. The findings of fact speak unmistakably of damages for breach of warranty and, at the beginning of the trial the court had ruled out the count for indemnity, allowing the trial to proceed upon the issues presented by the count for breach of warranty.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.