[No. C047837. Third Dist. July 10, 2007.]

BRITTALIA VENTURES, Plaintiff and Respondent, v.
STUKE NURSERY CO., INC., Defendant and Appellant.

[No. C048252. Third Dist. July 10, 2007.]

BRITTALIA VENTURES, Plaintiff and Appellant, v.
STUKE NURSERY CO., INC., Defendant and Respondent.

[No. C049334. Third Dist. July 10, 2007.]

BRITTALIA VENTURES, Plaintiff and Appellant, v.
STUKE NURSERY CO., INC., Defendant and Appellant.

**COUNSEL**

Parish & Small, William H. Parish and Kenneth M. Wentz III for Plaintiff and Respondent and for Plaintiff and Appellant.

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Amy E. Margolin; Askew & Archbold, Richard M. Archbold; Read & Aliotti and Michael B. Read for Defendant and Appellant and for Defendant and Respondent.

**OPINION**

**DAVIS, Acting P. J.**—These consolidated appeals involve a breach of contract. Defendant Stuke Nursery Co., Inc. (Stuke), appeals from the judgment and denial of its postjudgment challenges, and from the postjudgment award of attorney fees, all in favor of plaintiff Brittalia Ventures (Brittalia). Brittalia cross-appeals from the amount of attorney fees awarded.

The key issue concerned what comprised the contract between Stuke and Brittalia. We shall affirm the judgment but reverse the award of attorney fees because the contract between the parties did not contain an attorney fee provision.

On the attorney fee issue, we conclude that a prevailing party cannot obtain attorney fees under Civil Code section 1717 if the contract it championed did not contain an attorney fee provision, notwithstanding that the losing party defended the matter by championing a different contract that did contain an attorney fee provision.

BACKGROUND

In early 1997, Craig Podesta (Podesta), a walnut farmer doing business as RDJ Farms, Inc. (RDJ Farms), contacted Stuke about purchasing Howard walnut trees for a 200-acre orchard. Podesta wanted to plant the orchard in a "hedgerow" configuration consisting of 20,000 trees. A hedgerow configuration costs significantly more initially, but yields significantly more over time because its hedge-like quality permits greater density and mechanized farming; uniform-sized trees are a must, however, to establish the hedge effect. Podesta intended to sell the Howard walnuts to Japan, where buyers apparently enjoyed their unique flavor.

Podesta had heard that Stuke had had a problem with crown gall—a cancer-like, localized tumor disease—which, in its most advanced stages, can kill a tree and devastate an orchard. According to Podesta, he raised the crown gall issue with Stuke. He was assured by Tommie York (York), who handled sales for Stuke, and by Ron Snyder (Snyder), an expert whom Stuke had hired, that Stuke had corrected the problem. York testified that Stuke had a standard response to crown gall inquiries—Stuke would assure growers that they would be buying trees that were not infected with crown gall. (Crown gall is a common condition. In its early stages, it is difficult to detect.)

Satisfied with these assurances, Podesta, through RDJ Farms, eventually ordered 14,000 Howard walnut trees (with paradox rootstock) from Stuke in late February 1997 for approximately $190,000 (the other 6,000 trees to be planted came from another nursery, Bonilla). This order was documented in a written confirmation dated February 24, 1997, and a corresponding written invoice dated January 30, 1998. We will refer to these two documents collectively as the 1997 confirmation-invoice.

The confirmation part of the 1997 confirmation-invoice was signed by York on behalf of Stuke and by Podesta on behalf of RDJ Farms. Both the confirmation and the invoice noted RDJ Farms's deposit payment of $30,030, and each document contained a number of preprinted standard provisions (that were neither discussed nor read). These standard provisions included a disclaimer of express and implied warranties, an "as is" sale statement, a one-year statute of limitations, and a limitation of the buyer's damages to the trees' purchase price. The 1997 confirmation-invoice also included a royalty

fee of $14,000 ($1 per tree that Stuke collected on behalf of the University of California, which had patented the Howard variety).

In 1998, RDJ Farms and Stuke cancelled the 1997 confirmation-invoice. Evidence showed that each side had its reasons for doing so.

For RDJ Farms, Podesta was not keen on being the last person likely to pay the Howard royalty, which was expiring on April 1, 1998, and any orchard planting would be occurring after that date. Furthermore, for tax purposes, Podesta in the interim had now made RDJ Farms his processing company and Brittalia his farming company.

Stuke, for its part, had made a computational error in the 1997 confirmation-invoice that understated the price of the trees by $14,000.[1] Furthermore, Stuke wanted the entire purchase price to be paid in advance.

Consequently, as York explained, the 1997 confirmation-invoice "was . . . cancelled, no royalty was paid, and that contract was forgotten about."

Stuke then sent a written purchase proposal to Brittalia dated February 19, 1998. This proposal listed each of the categories of the 14,000 Howard trees to be sold, corrected the computational error in price (now, a total price was due of $175,620.22), deleted the royalty fee, specified the delivery and cold storage fees, and specified the conditions of sale (cash in advance; customer waives inspection; and return of the $30,030 deposit). Brittalia sent Stuke a check dated February 19, 1998, for the $175,620.22, stating in an accompanying note: "Paid in Full invoice of 2/19/98[.] Thank you for your time and trouble on this matter[,] it is greatly appreciated, you can be assured that you have a happy customer. Craig Podesta[.]" The February 19, 1998, documents did not contain any of the standard preprinted provisions (warranty disclaimers, limitations on bringing suit and requesting damages) contained in the 1997 confirmation-invoice.

Stuke then delivered the 14,000 trees to Brittalia over three days in late April 1998, accompanied by three delivery receipts. Each receipt was signed

---

[1] At oral argument, counsel for Stuke disputed that Stuke had made this computational error. But there is substantial evidence showing that Stuke, in the 1997 confirmation-invoice, had understated the price of the ordered trees by $14,000, by erroneously multiplying their individual price by the ordered amount for each of the six root sizes, resulting in the $14,000 undercharge (e.g., the 1997 confirmation-invoice erroneously multiplied the individual price of $10.75 by the ordered amount of 1,132 for the 1/2-inch size as totaling $11,037 when it actually totaled $12,169; and the individual price of $11.25 by 3,720 for the 5/8-inch size as totaling $38,130 when it actually totaled $41,850, and so on in similar fashion for the remaining four other root sizes ordered). As we shall see, a subsequent written purchase proposal, dated February 19, 1998, properly multiplied these figures, arriving at an amount of $14,000 more for the ordered trees.

by Brittalia's orchard foreman, and contained the standard preprinted provisions on warranty disclaimers and lawsuit limitations noted above.

Stuke also sent Brittalia a final invoice dated May 18, 1998, acknowledging the $175,620.22 paid, but containing changes to the delivery and cold storage charges; these charges still comprised a small fraction of the total purchase price. This invoice also contained the standard preprinted provisions on warranty disclaimers and lawsuit limitations noted above.

Toward the end of 1999, Stuke alerted Brittalia that it may have delivered some walnut trees that were not Howards. It turned out that 5,040 of the 14,000 Stuke trees were not Howards. Stuke assured Brittalia that it would fix the problem.

As these remedial efforts (regrafting) were underway, Podesta began noticing around the spring of 2000 that some of the Stuke trees were displaying crown gall. Podesta notified Stuke about the crown gall, but Stuke did not respond; the non-Howard problem remained the focus. Stuke continued to refuse to discuss the crown gall issue. (By the time of trial, approximately 43 percent of the Stuke trees were visibly infected with crown gall, compared with less than 1 percent of the trees in the Bonilla section of the orchard.)

Stuke continued to work with Brittalia regarding the non-Howard problem until April 2001, when York informed Podesta that Brittalia would now have to sue Stuke.

Brittalia did just that, suing Stuke for breach of express warranty regarding the non-Howard trees, and for breach of implied warranties concerning the non-Howards and the crown gall problem. (Brittalia had also sued for fraud and negligent misrepresentation, but dismissed those claims at trial.)

At trial, Brittalia argued that its contract with Stuke consisted only of the February 19, 1998, purchase proposal and check (and warranties not excluded therein). Brittalia sought $7.8 million in damages. Stuke defended, contending that the contract included the additional, standard preprinted provisions (including the warranty disclaimers and the lawsuit limitations) contained in the documents beginning with the 1997 confirmation-invoice and culminating with the May 18, 1998, final invoice.

In a general verdict, the jury found in Brittalia's favor on its claims for breach of express warranty and for breach of implied warranty, and awarded Brittalia nearly $4.5 million in damages. Stuke moved unsuccessfully for judgment notwithstanding the verdict and for new trial. The trial court

subsequently awarded Brittalia nearly $750,000 in attorney fees as the prevailing party on the contract claims pursuant to Civil Code section 1717.

These appeals ensued, which we consolidated at the parties' request.

1. *Standard of Review and Posture of Appeal Regarding Contractual Issues*

We agree with Brittalia that the underlying issue in this appeal asks: What are the terms of the contract governing Stuke's sale of goods to Brittalia? The underlying question, then, is not what the contract at issue *means*, but what that contract *is*. And the evidence on this question was conflicting. Consequently, our standard of review is the substantial evidence test rather than an independent interpretation of the contract—i.e., is there any substantial evidence to support the jury's determination of what comprised the contract? (See Judicial Council of Cal. Civ. Jury Instns. (2006–2007), CACI Nos. 300, 302 [regarding essential factual elements of contract formation—both given here]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362] (*Foreman & Clark*) [" 'whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact' "]; contra, *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839] [contractual interpretation is ordinarily a question of law].)

And the parties do not dispute that the trial court correctly instructed the jury as follows:

—Brittalia contends that Stuke's February 19, 1998, purchase proposal to Brittalia constitutes the entire agreement of the parties, except as to those matters implied by law. Stuke contends that the contract includes the additional terms and conditions set forth in the various documents relating to the purchase and sale of the 14,000 trees. (Stuke's special instn. No. 1.)

—In determining the terms of the contract (the instructions inartfully phrased this concept as determining the "meaning" of the contract), jurors may consider all of the circumstances surrounding the contract, including the negotiations and statements of the parties prior to the contract; the object, nature, and subject matter of the contract; and the subsequent acts and conduct of the parties. (Stuke's special instn. No. 2.)

—Brittalia claims that Stuke breached an express warranty that the walnut trees would be Howards, and breached implied warranties of merchantability

and fitness for a particular purpose that the trees would be Howards and would not be infected with crown gall. (CACI Nos. 1230–1232.)

—Stuke claims that it is not responsible for any harm to Brittalia because it limited its representations regarding the trees, and eliminated any implied representations relating to merchantability or fitness for a particular purpose given the sale of the trees "as is" and the parties' prior dealings, their course of performance, and trade usage. (CACI Nos. 1241, 1242.)

### 2. *The Jury's Determination of the Terms of the Contract*

That brings us to the issue of whether there is any substantial evidence to support the jury's implicit factual finding that the contract between Brittalia and Stuke was comprised only of Stuke's February 19, 1998, purchase proposal and Brittalia's check of that same date (and warranties not excluded therein).

■ Stuke centers its case on all the other documents relating to its interaction with Podesta/RDJ Farms/Brittalia in addition to the February 19, 1998, purchase proposal. These other documents encompass a February 4, 1997, confirmation (that preceded the 1997 confirmation-invoice and confirmed a different mix of trees); the 1997 confirmation-invoice (Podesta, on behalf of RDJ Farms, signed the confirmation part of this); the three April 1998 delivery receipts; and the final invoice of May 18, 1998. All of these other documents contained standard, preprinted provisions disclaiming all warranties and specifying the sale of the "goods . . . 'as is' and with all faults." Under the California Uniform Commercial Code, unless excluded or modified, a warranty of merchantability (i.e., fitness for ordinary purposes) is implied in any sale by a seller-merchant with respect to goods of the kind sold, and a warranty of fitness for a particular purpose is implied where the seller has reason to know that the buyer desires goods to be used for a particular purpose and is relying on the seller's skill and judgment to furnish such goods. (See Cal. U. Com. Code, §§ 2314, subds. (1), (2)(c), 2315, 2316; see 4 Witkin, Summary of Cal. Law (10th ed. 2005) Sales, §§ 70–72, pp. 79–81.) Implied warranties extend to latent defects. (*Moore v. Hubbard & Johnson Lumber Co.* (1957) 149 Cal.App.2d 236, 240–241 [308 P.2d 794].)

In reviewing the sufficiency of the evidence in a civil appeal, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the trier of fact's conclusion. (*Foreman & Clark, supra*, 3 Cal.3d at p. 881.)

Here, the evidence showed that the 1997 confirmation-invoice between RDJ Farms and Stuke was "cancelled" and "forgotten about." The February

4, 1997, confirmation, which was a forerunner to the 1997 confirmation-invoice, consequently fell with the latter's demise. Evidence showed that each side had its reasons for cancelling the 1997 confirmation-invoice (for Podesta, the deletion of the Howard royalty payment, and the tax-based change of his farming operation from RDJ Farms to Brittalia; for Stuke, the correction of the $14,000 undercharge error, and the chance to be paid in full in advance).

This cancellation rendered the February 19, 1998, purchase proposal between Brittalia and Stuke the pivotal document in their contractual relationship. This proposal specified the conditions of sale (cash in advance; customer waives inspection; return of the $30,030 deposit). These conditions did not include a warranty disclaimer or specify an "as is" sale.

The warranty disclaimer and "as is" provisions did, however, return to the transactional fold in the form of the three delivery receipts in April 1998 and the final invoice in May 1998. But the jury could reasonably discount the significance of these documents in the contractual equation. These documents came after the pivotal February 19, 1998, purchase proposal had been accepted by Brittalia's purchase check (payment in advance). The purchased trees were then simply delivered to Brittalia via the delivery receipts, which were signed by Brittalia's orchard foreman; evidence showed that the foreman did not have the authority to enter into contracts on Brittalia's behalf. The May 1998 final invoice essentially reiterated the February 1998 purchase proposal, but contained immaterial modifications to the delivery and cold storage fees.

In addition to the documents aside from the February 19, 1998, purchase proposal, Stuke points to evidence of (1) the parties' course of performance; (2) their prior dealings; and (3) custom in the walnut farming industry (trade usage). We discuss these in turn.

The parties' course of performance did encompass the "other" documents just described that did contain warranty disclaimers and "as is" provisions. But as we have seen, the jury reasonably could have found these were not the actual contract documents. More importantly, there was course-of-performance evidence that Stuke had assured Podesta it had corrected its crown gall problem at its nursery; that Stuke's standard response to crown gall inquiries was to assure growers that the trees it was selling were not infected with crown gall; and that Stuke acknowledged its responsibility here for delivering trees of the correct type and without significant crown gall infection. Along these lines, evidence showed that Stuke initially identified and worked with Brittalia to fix the non-Howard problem, and only balked at remedial efforts when a significant crown gall problem was also disclosed. There is no evidence that Stuke, prior to this lawsuit, ever invoked any warranty disclaimer or "as is" provision in its contract with Brittalia.

The evidence of the parties' prior dealings consisted of two dated invoices, one in 1983 and the other in 1988, which contained a warranty disclaimer and an "as is" provision. But these two invoices also stated: "All stocks are guaranteed to be delivered to buyer in good condition, to be up to grade, and to pass State inspection. Stuke . . . will replace, regraft or refund the cost of any trees falling short of this guarantee."

As for the walnut industry's custom, Stuke's evidence consisted only of its dealings with Podesta; Bonilla's bill to Podesta that contained a warranty disclaimer; and Podesta's testimony that he had signed contracts with other nurseries containing warranty disclaimers.

This evidence, together with the evidence relied on by Stuke of the other documents aside from the February 19, 1998, purchase proposal, is not sufficient, as a matter of law, to override the substantial evidence supporting the jury's determination of the terms comprising the Stuke-Brittalia contract at issue here.

We conclude there is substantial evidence to support the jury's implicit finding that the contract between Stuke and Brittalia did not contain a warranty disclaimer or an "as is" provision. Consequently, the jury's findings that Stuke breached express and implied warranties as to Brittalia cannot be overturned on this basis.

Also, the jury's supported implicit finding that the contract between Stuke and Brittalia encompassed the February 19, 1998, purchase proposal (and purchase check) without the standard, preprinted provisions found in the other documents asserted by Stuke defeats three other contentions that Stuke has raised on appeal. Stuke has contended that (1) Brittalia's implied warranty claims were barred by the standard provision on warranty disclaimers; (2) Brittalia's express and implied warranty claims were barred by the standard provision on statute of limitations; and (3) any damages were limited to the purchase price by the standard provision on damage limits.

### 3. *Inherent Susceptibility and Timely and Adequate Notice Regarding Crown Gall*

Stuke raises two other points in arguing that it was not liable for breaching any implied warranties concerning crown gall.

First, Stuke argues it was undisputed that paradox rootstock walnut trees are inherently susceptible to crown gall and, citing *Pearson v. McKinney* (1911) 160 Cal. 649 [117 P. 919], that a warranty "beyond human control" cannot be implied. (160 Cal. at p. 657.)

But evidence showed that Stuke did not hide behind this shell in dealing with Brittalia or with other walnut growers. As noted, there was evidence that Stuke (1) assured Podesta that it had corrected its crown gall problem; (2) responded to growers in standard fashion that its trees were not infected with crown gall; and (3) acknowledged its responsibility here for ensuring that its trees were not significantly infected with crown gall.

■ Stuke counters, however, that Brittalia's expert testified that paradox rootstock walnut trees are "highly susceptible" to crown gall, which is almost impossible to eradicate completely; that Stuke's expert testified that paradox rootstock always involves some level of crown gall—it is "a fact of life"; and that Podesta himself acknowledged these unpleasant realities in his testimony. However, this evidence was presented in the context that with crown gall, it is a matter of *degree*, and that the degree Podesta was experiencing—43 percent visible crown gall in the Stuke portion of his orchard—was beyond any reasonable degree of the disease (for example, the Bonilla Nursery portion of Brittalia's orchard displayed less than 1 percent of crown gall). An implied warranty of merchantability means "fair average quality within the description" of the goods, and "fit for the ordinary purposes for which such goods are used." (Cal. U. Com. Code, § 2314, subd. (2)(b), (c).) Moreover, there was evidence that Stuke walnut trees that had been planted for three other growers prior to Podesta's planting had resulted in respective crown gall percentages of 55, 60, and 85. And Stuke concedes that its crown gall expert at trial had previously been hired by one of these growers and concluded that Stuke was to blame for that grower's crown gall problem.[2]

As for the second point, Stuke contends that Brittalia failed to carry its burden of showing that it timely and adequately notified Stuke of the implied warranty claims regarding the crown gall. We disagree.

---

[2] At oral argument, counsel for Stuke emphasized a sentence in its brief that evidence of the degree of crown gall was irrelevant because Brittalia neither pleaded nor argued this theory of liability. We disagree. Preliminarily, we note that Stuke does not claim that it objected in any fashion to Brittalia's evidence on crown gall degree. In its complaint, Brittalia alleged that Stuke breached the implied warranty of merchantability because the trees "were infected with crown gall." As noted, an implied warranty of merchantability means *"fair average quality within the description"* of the goods, and, as the jury was instructed here, "fit for *the ordinary purposes for which such goods are used"* (Cal. U. Com. Code, § 2314, subd. 2(b), (c), italics added) and of *"the expected quality"* (CACI No. 1231, italics added). These italicized portions align with the concept of degree and, as we have just seen, Brittalia presented evidence in line with this theory of degree (not to mention evidence of certain statements by Stuke regarding its trees and crown gall). Brittalia's complaint, therefore, properly pleaded the ultimate fact regarding breach of the implied warranty of merchantability that the trees were infected with crown gall. Brittalia did not have to plead the evidentiary fact of the degree of infection. (See 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 339–340, pp. 436–439.)

The trial court properly instructed the jury on this point by stating that Brittalia had to prove that it took reasonable steps to notify Stuke within a reasonable time that the trees did not have the expected quality (i.e., merchantability) and were not suitable (i.e., fitness for particular purpose). (See Cal. U. Com. Code, §§ 2314, 2315; see also 4 Witkin, Summary of Cal. Law, *supra*, Sales, §§ 70–72, pp. 79–81; CACI Nos. 1231, 1232.)

Podesta brought the crown gall problem to Stuke's attention "early on" when he pointed out to York and Snyder in 2000 that crown gall was developing in the orchard. Later, Podesta informed York that crown gall "was manifest[ing] itself." Still later, Podesta notified Stuke of "increasing problems with crown gall." Podesta encouraged Stuke to come and help Brittalia. According to Podesta, Stuke simply refused to discuss the crown gall problem with him. In light of such refusal, how can Stuke blame Brittalia for failing to provide timely and adequate notice? Moreover, Brittalia's notifications took place in the context of Stuke's presale assurances to Podesta that Stuke's crown gall problem had been fixed and that Podesta's trees would not have crown gall.

We conclude that Stuke's points concerning inherent susceptibility and timely and adequate notice do not overturn the jury's findings in favor of Brittalia on the issue of implied warranties.

### 4. *Attorney Fees*

Pursuant to Civil Code section 1717, the trial court awarded Brittalia nearly $750,000 in attorney fees as the prevailing party on the contract claims.

The trial court found Brittalia was the prevailing party and "entitled to an award of attorney's fees under the contract as alleged by [Stuke] under Civil Code section 1717 because, had [Stuke] proved the terms asserted and prevailed at trial, it would have been entitled to attorney's fees incurred in defending against [Brittalia's] contract claims." We disagree and reverse the award of attorney fees to Brittalia.

We must begin with Civil Code section 1717 (hereafter, section 1717), which provides as pertinent: "(a) In any action on a contract, *where the contract specifically provides that attorney's fees* and costs, which are incurred *to enforce that contract*, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on *the contract*, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Italics added.)

Here, the contract that Brittalia enforced through bringing this action—the February 19, 1998, purchase proposal and check—does not contain any attorney fee provision. As a result, section 1717, as just quoted, presents a formidable barrier to Brittalia's contract-based attorney fee request. The February 19, 1998, purchase proposal and check does not "specifically provide[]" for any award of attorney fees "incurred to enforce *that* contract." (§ 1717, subd. (a), italics added.) It is that simple: Brittalia is not entitled to an award of attorney fees for enforcing the February 19, 1998, contract.

But Brittalia points to the mutuality purpose of section 1717 and to the fact that Stuke defended this contract action by arguing that a different contract applied (comprised of all the documents in the Stuke-Brittalia interaction); and that contract does contain an attorney fee provision.

■ The purpose of section 1717 is to ensure mutuality of remedy for attorney fee claims where a contractual provision allows recovery of attorney fees to only one party; section 1717 prevents the oppressive use of one-sided attorney fee provisions. (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 610 [71 Cal.Rptr.2d 830, 951 P.2d 399] (*Santisas*); *Hsu v. Abbara* (1995) 9 Cal.4th 863, 870–871 [39 Cal.Rptr.2d 824, 891 P.2d 804].) "Courts have recognized that section 1717 has this [mutuality] effect in at least two distinct situations." (*Santisas, supra,* at p. 610.)

The first situation is when the contract provides the right to attorney fees to one party but not to another. In that situation, section 1717 allows recovery of attorney fees by whichever contracting party prevails in the action, regardless of whether the contract provided the right to attorney fees to that party. (*Santisas, supra,* 17 Cal.4th at pp. 610–611.)

The second situation is "when a person sued on a contract containing a provision for attorney fees to the prevailing party defends the litigation 'by successfully arguing the inapplicability, invalidity, unenforceability, or nonexistence of the same contract.' (*North Associates* v. *Bell* (1986) 184 Cal.App.3d 860, 865 [229 Cal.Rptr. 305].)" (*Santisas, supra,* 17 Cal.4th at p. 611.) "If section 1717 did not apply in this situation, the right to attorney fees would be effectively unilateral . . . because only the party seeking to affirm and enforce the agreement could invoke its attorney fee provision. To ensure mutuality of remedy in this situation, it has been consistently held that when a party litigant prevails in an action on a contract by establishing that the contract is invalid, inapplicable, unenforceable, or nonexistent, section 1717 permits that party's recovery of attorney fees whenever the opposing parties would have been entitled to attorney fees under the contract had they prevailed. (See, e.g., *Reynolds Metals Co.* v. *Alperson* (1979) 25 Cal.3d 124, 128–129 [158 Cal.Rptr. 1, 599 P.2d 83]; *North Associates* v. *Bell, supra,* at p. 865.)" (*Santisas, supra,* 17 Cal.4th at p. 611.)

Brittalia pins its attorney fee hopes on the second situation described in *Santisas*, where the defending party successfully argues the inapplicability of a contract that contains an attorney fee provision. An initial problem with Brittalia's approach is readily apparent, however. The contract on which Brittalia sued does not contain an attorney fee provision.

Brittalia argues, though, that had Stuke prevailed in its defense to Brittalia's contract action—i.e., that the contract between Brittalia and Stuke encompassed not just the February 19, 1998, purchase proposal and check, but all the other documents comprising their interaction on this purchase—then Stuke would have been entitled to its attorney fees because these other documents contained an attorney fee provision. Under section 1717's purpose of mutuality of remedy for contractual attorney fee claims, the argument goes, Brittalia is entitled to its attorney fees here. Brittalia cites to *North Associates v. Bell, supra,* 184 Cal.App.3d 860 (*North Associates*), in support of its argument; as the quote from *Santisas* above shows, the high court in *Santisas* cited *North Associates* with approval as well.

In *North Associates*, the court upheld an award of attorney fees to North under section 1717. North had sued Bell for unlawful detainer based on a commercial lease that contained an attorney fee provision. Bell unsuccessfully defended by alleging that he had been granted extensions under the "same written lease." (*North Associates, supra,* 184 Cal.App.3d at p. 865.) Had Bell successfully defended, he would have been entitled to attorney fees under this lease. North prevailed in the lawsuit, although the trial court found that this lease had expired and a new lease had taken its place (which also had an identical attorney fee provision). (*Id.* at pp. 865–866; see *id.* at p. 862.)

Given this context, the *North Associates* court concluded: "It would be inequitable to deny attorney fees to North, the prevailing party, when Bell would have been entitled to an award of attorney fees had he prevailed under the same facts. In short, Bell's contention in his pleadings and at trial that his continued occupancy of the subject premises was under an extension of the original lease, which lease provided for attorney fees for the prevailing party in any dispute thereon, provides ample justification for the trial court's award of attorney fees to North, even though the court found that the original lease was no longer in effect at the time of Bell's eviction." (*North Associates, supra,* 184 Cal.App.3d at p. 866.)

Brittalia's argument for attorney fees based on *North Associates* and the second situation described in *Santisas* fails for three reasons.

First, the contract action in *North Associates* was brought on a contract that contained an attorney fee provision; in parallel fashion, the second situation

described in *Santisas* involves "a person sued on a contract containing a provision for attorney fees to the prevailing party." (*Santisas, supra,* 17 Cal.4th at p. 611.) Here, Brittalia brought an action on a contract that does *not* contain an attorney fee provision.

Second, in *North Associates,* the defense was based on the *"same* written lease" that contained the attorney fee provision and was brought "under the *same* facts." (*North Associates, supra,* 184 Cal.App.3d at pp. 865–866, italics added.) Here, Stuke defended by alleging the purchase encompassed a *different* contract with *different* facts.

In light of these first two reasons, there simply was no "mutuality" of attorney fee remedy that Stuke could have invoked to obtain its attorney fees under section 1717. (See *North Associates, supra,* 184 Cal.App.3d at p. 865; *Santisas, supra,* 17 Cal.4th at p. 610.)

■ And third, and most importantly here, "courts have consistently held that the award of Civil Code section 1717 contractual attorney's fees is to be governed by equitable principles." (*Jones v. Drain* (1983) 149 Cal.App.3d 484, 489 [196 Cal.Rptr. 827]; accord, *North Associates, supra,* 184 Cal.App.3d at p. 865; *International Industries, Inc. v. Olen* (1978) 21 Cal.3d 218, 224 [145 Cal.Rptr. 691, 577 P.2d 1031].) ■ It simply is unfair to award Brittalia its attorney fees under section 1717. Brittalia cannot be allowed to win on its contract action by championing one contract without an attorney fee provision, and then turn around and ask for attorney fees as prevailing party based on a different contract, with an attorney fee provision, that Brittalia had to defeat to secure its victory. That would provide a new twist on the concept of contract shopping. As this court aptly stated in *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32 [100 Cal.Rptr.2d 627]: "[S]ection 1717 . . . only comes into play where a contract specifically provides for attorney fees. 'The primary purpose of . . . section 1717 is to ensure mutuality of remedy for attorney fee claims under contractual attorney fee provisions.' (*Santisas . . . , supra,* 17 Cal.4th at p. 610.) It cannot be bootstrapped to provide for attorney fees for breach of a contract that has no attorney fees provision." (*Khajavi, supra,* 84 Cal.App.4th at p. 63, fn. 16.) In short, Brittalia has gotten its contractual cake and will now have to eat its own attorney fees.[3]

---

[3] Our determination that Brittalia is not entitled to an award of attorney fees moots the remaining contentions involving the subject of attorney fees in the appeal and the cross-appeal because those contentions are premised on there being an attorney fee award.

## DISPOSITION

The judgment is affirmed. The order awarding attorney fees to Brittalia is reversed. Brittalia is awarded its costs on appeal except as to those costs relating to the attorney fee appeal (C049334), which are awarded to Stuke.

Robie, J., and Butz, J., concurred.

Petitions for a rehearing were denied August 2, 2007, and on July 12, 2007, the opinion was modified to read as printed above. The petition of respondent Brittalia Ventures for review by the Supreme Court was denied October 10, 2007, S155547.