Filed 7/27/22  Evans v. Bosa Development Cal. II CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| COURTNEY EVANS,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>BOSA DEVELOPMENT CALIFORNIA II, INC.,<br><br>    Defendant and Respondent. | D078272, D078818<br><br><br>(Super. Ct. No. 37-2019-00032165-CU-BC-CTL) |

CONSOLIDATED APPEALS from a judgment and order of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed.

Vivoli Saccuzzo, Michael W. Vivoli and Jason P. Saccuzzo for Plaintiff and Appellant.

Behmer & Blackford, Brian L. Behmer; Law Offices of Mary A. Lehman and Mary A. Lehman for Defendant and Respondent.

INTRODUCTION

Courtney Evans entered into negotiations with Bosa Development California II, Inc. (Bosa) to lease commercial space on the ground floor of a new luxury condominium building that Bosa was developing.  During

negotiations, Bosa's broker provided Evans' broker with a letter outlining "the general terms and conditions which [Bosa] would consider as the basis for a lease agreement." The letter stated the proposal was expressly made "subject to and contingent upon" three specific conditions, including the "[m]utual execution of the Lease." Evans signed the letter to indicate her agreement and the parties, through their brokers, began negotiating a lease agreement. They exchanged a " 'red-lined' " draft lease agreement but, approximately one year later, Bosa ended the negotiations, without executing a lease agreement.

Evans sued Bosa for breach of contract, among other causes of action. She claimed the letter from Bosa's broker was a binding contract that, at a minimum, required Bosa to negotiate a lease agreement in good faith. Bosa demurred. It asserted the letter was not a binding contract, as it expressly stated any agreement was subject to contingencies, including the mutual execution of a lease agreement, which never occurred. The trial court granted Evans leave to amend the complaint once, but then sustained Bosa's second demurrer without leave to amend when Evans was unable to cure the pleading deficiencies. Consequently, it entered a judgment of dismissal of Evans' claims against Bosa. Based on an attorney fee provision in the unsigned draft lease agreement, the trial court awarded Bosa attorney fees as the prevailing party.

Evans filed two separate appeals, one from the judgment of dismissal and one from the order awarding Bosa attorney fees. We consolidated the appeals for disposition on our own motion. Having reviewed Evans' operative First Amended Complaint (FAC), we conclude it does not plead facts sufficient to state any cause of action against Bosa. We further conclude the

trial court did not err in awarding Bosa attorney fees as the prevailing party. Accordingly, we affirm both the judgment of dismissal and the fee award.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*The Lease Negotiations*[1]

Evans is the owner of a wellness studio called Level Ten Pro Performance (Level Ten).  In 2017, Evans hired a commercial real estate brokerage firm, Hughes Marino, Inc. (HM), to help her secure a larger space for her growing business.  HM suggested Evans lease a space on the ground floor of a new luxury condominium building that Bosa was developing, Pacific Gate.  On behalf of Evans, HM began discussing a possible lease with Bosa's broker, CBRE Group, Inc. (CBRE).

After preliminary verbal negotiations, HM sent CBRE "a proposed list of terms pursuant to which [Evans] would lease space on the first floor of the Pacific Gate building."  On October 30, 2017, CBRE responded with a letter, addressed to HM, with a subject line of "Proposal to Lease at Pacific Gate, San Diego, California" (the letter).[2]  The letter began with:  "Thank you for your proposal on behalf of Level 10 Pro Performance.  Having reviewed the information provided, [Bosa] has asked me to provide you with the following redline counter lease proposal outlining the general terms and conditions which [Bosa] *would consider* as a basis for a lease agreement with Level 10 Pro Performance at Pacific Gate."  (Italics added.)  In the very next sentence, the letter requested that Evans, "*Please provide your response in Word*

---

[1]     Our recitation of the facts is derived from Evans' FAC.

[2]     Evans attached a copy of the letter as Exhibit A to the FAC.

3

*'redline' in the same order as the items are presented below*." (Boldface omitted.)

Over the next five pages, the letter set forth approximately 23 "general terms and conditions." The terms and conditions included, among others, that Bosa would lease to Evans "approximately 4,800 rentable square feet on the first floor of the [Pacific Gate] Building," the term of the lease would be for 10 years, and the rent would be $3 per rentable square foot, with a 3 percent annual increase.

After stating the terms and conditions, the letter stated there were "CONTINGENCIES." (Boldface omitted.) Specifically, the letter provided that, "This proposal shall be subject to *and contingent upon* the following: [¶] A. Approval of Tenant, terms and conditions by Landlord's Real Estate Committee; [¶] B. Landlord's review and approval of Tenant's most recent financial statements; [¶] C. *Mutual execution of the Lease.*" (Italics added.)

The letter closed with: "Once you have had an opportunity to review this proposal, please feel free to call me with any questions or comments you may have. We look forward to your response and to moving toward mutual lease execution."

At the bottom of the letter, after a closing salutation from CBRE's Vice President, there was a line that read "Agreed and Accepted:" followed by signature lines for "LANDLORD" and "TENANT." On November 1, 2017, Evans "DocuSigned" her name under "TENANT" and returned the letter to HM, without making any changes. Evans never received a copy of the letter with Bosa's signature, but HM told her, " 'everything's signed and we're good to go.' " Evans knew, however, when she signed the letter, that Bosa was still in the permitting process with the City of San Diego and the exact location of

4

a demising wall[3] that would define the available space had not yet been determined. Evans believed the parties "agreed to negotiate the material terms of their lease with the understanding the final square footage would be determined by the location of the demising wall."

After signing the letter, Evans provided all of the financial information Bosa requested. In addition, she provided schematics and plan renderings, "ostensibly for use by Bosa in building out the space for [Evans] and for Bosa to determine the exact placement of the demising wall." Evans incurred "thousands of dollars in out-of-pocket costs" as a result of these efforts. Bosa told Evans her studio was a " 'perfect fit' for Pacific Gate" and "never once suggested the parties did not have a binding agreement." Evans believed Bosa had committed to renting the Pacific Gate space to her, and did not look for other available spaces for her studio.

Through their brokers, the parties began negotiating a "long form lease agreement" and exchanged "a 'red-lined' draft" of a "RETAIL LEASE AGREEMENT" (draft lease agreement).[4] The draft lease agreement contained a number of proposed changes in redline and approximately 60 comments. Many of the comments ended with a note indicating the proposed change at issue was either "Agreed to," "Substantially agreed to," or "Not agreed to." The draft was not dated, and it is not readily apparent which party had made which edits or comments.

After "more than a year of negotiations" over the draft lease agreement, HM told Evans that "Bosa had 'decided to go a different direction' " and

[3] A demising wall is a partition that separates the space belonging to two different tenants, or that separates a tenant's space from a common area.

[4] Evans attached a copy of the red-lined draft of the lease agreement as Exhibit B to the FAC.

would not be moving forward with the execution of the lease with Evans. Evans asked HM for a copy of the letter signed by Bosa. It was then that HM told Evans that Bosa had not actually signed the letter, "beyond its having transmitted the offer through its authorized agent." When Evans "asked HM why it had apparently lied to [her] about Bosa's execution of [the letter,] HM's only response was that it 'doesn't really matter.' "

## II.

### *The Lawsuit*

A. *Bosa's Demurrer to the Original Complaint*

On June 21, 2019, Evans sued HM and Bosa. In her original complaint, she asserted causes of action for professional negligence, breach of fiduciary duty, and constructive fraud against HM,[5] and causes of action for breach of contract, breach of duty to negotiate in good faith, and specific performance against Bosa. Evans alleged HM knowingly and negligently misled her regarding Bosa's execution of the letter, which she referred to in her complaint as the " 'LOI.' "[6] But regardless of whether Bosa actually signed the letter, Evans alleged she accepted "Bosa's offer to lease space to her under the terms of the LOI and upon accepting, a binding agreement was formed." Bosa then "breached the parties' contract by failing and refusing to

---

[5] After filing an answer, HM moved for summary judgment. The trial court issued a tentative ruling granting summary adjudication in part and denying it as to the claims for negligence and breach of fiduciary duty. Because the tentative ruling was issued after the judgment of dismissal in favor of Bosa, we have no record of the court's final ruling on HM's summary judgment motion. However, since the claims against HM are not at issue here and HM is not a party to the present appeal, we need not discuss the proceedings as to HM further.

[6] Although the acronym LOI is not specifically defined in the complaint, we assume it stands for the common term, letter of intent.

6

sign and return a written lease agreement in conformance with the material terms of [the LOI], and by outright preventing the parties' contract from reaching fruition through a signed lease agreement; an act completely within Bosa's control."

Bosa demurred. It asserted the complaint "reveal[ed] *no* binding agreement of any sort" between the parties. Bosa argued the letter, on its face, was a "non-exclusive Letter of Intent" that did not contain any obligatory language. Instead, the letter was "expressly subject to conditions, including (not surprisingly), consummation of a lease which never occurred." Bosa also argued the "*unsigned redlined draft lease*" agreement "reflect[ed] roughly 60 comments and proposed edits, addressing numerous material terms—39 of which were expressly '[n]ot agreed to,' " and thus demonstrated the parties never agreed to the essential elements of an enforceable lease. Further, Bosa asserted the complaint failed to state claims for breach of duty to negotiate in good faith and for specific performance, for largely the same reasons: the letter was not binding and did not confer any obligation on either party to do anything.

Evans opposed the demurrer. She argued the complaint adequately pled a cause of action for breach of contract based *both* on the letter—which she now referred to as "the accepted proposal/offer"—and the draft lease agreement, which she asserted "Bosa later refused, in bad faith, to sign after all other alleged 'contingencies' within the parties['] agreement had either been met or prevented by Bosa." Despite previously referring to the letter as " 'the LOI,' " Evans now asserted the letter did not contain the words " 'letter of intent,' " and that it was, instead, a " 'Proposal.' "

Evans acknowledged the letter expressly contained three contingencies, but argued the complaint adequately pled that she satisfied the first two

7

contingencies. As to the third, Evans asserted the complaint "expressly plead[ed] that [she] fully complied with her obligation to negotiate . . . a lease consistent with the Proposal [the letter], but that Bosa breached its obligation to . . . do the same." The draft lease agreement, she asserted, " 'evidence[d] [Evans'] own performance of her obligation to negotiate in good faith towards execution of a long form written lease agreement, and the understanding that Bosa would lease space to [her] in the Pacific Gate property under the material terms set forth and not "red-lined" within the draft lease.' " She asserted, "[i]n sum, the [c]omplaint allege[d] that the parties executed a written agreement with only three 'contingencies'—two of which [Evans] satisfied and the third of which Bosa actively prevented, in breach of both the contract and its duty to negotiate in good faith the contemplated lease." Evans did not address her cause of action for specific performance and, instead, asserted the complaint adequately alleged a claim for promissory estoppel.

The trial court sustained Bosa's demurrer as to all three causes of action. On the breach of contract claim, the court rejected Evans' assertion that the draft lease agreement demonstrated "an agreement as to the terms for which no 'redline' changes [were] made." Instead, the court found the draft "actually" demonstrated the letter "was not an agreement, but rather a continuing negotiation." It found the "[e]ssential terms were not agreed upon in" either the letter or the draft lease agreement. As one example, the court explained: The letter "indicates the rentable square footage as 4,800 square feet." The draft lease agreement "shows that [Bosa] changed the square footage to 3,686 square feet and [Evans] redlined that amount, offering 5,416 square feet. This term was essential not only to the actual space size but also to the amount of rent, which was tied to the square footage." The court

8

further found the draft lease agreement "contain[ed] many other significant redline changes, indicating that the parties were in the midst of negotiating 'toward a mutual lease execution.' " It therefore concluded Evans did not allege sufficient facts to establish a cause of action for breach of contract.

For the same reasons, the trial court found the complaint failed to adequately allege facts to support the remaining causes of action. It acknowledged "that parties may enter into a binding contract to negotiate an agreement," but reiterated the letter was "not an enforceable contract" and thus concluded there was "no contractual compulsion to negotiate." Because it found insufficient facts to establish a contract, the trial court also determined the claim for specific performance failed and noted that Evans made "no effort to support this cause of action." Although Evans never asserted a promissory estoppel claim, the court noted that she oddly asserted in opposition to the demurrer that her "promissory estoppel claim [wa]s sufficiently alleged." Because the court found "there appear[ed] to be a possibility that [Evans] may be able to allege promissory estoppel," it granted her leave to amend the complaint to add the claim.

B.    *Bosa's Demurrer to the FAC*

Evans filed the FAC approximately two weeks later. Despite the trial court's ruling sustaining Bosa's demurrer on all three causes of action and granting Evans leave to amend only "to add a cause of action for promissory estoppel," the FAC asserted the same two causes of action for breach of contract and breach of duty to negotiate in good faith against Bosa, in addition to the new claim of promissory estoppel.

The factual allegations in the FAC were substantially similar to the original complaint. As with the original complaint, Evans attached a copy of the letter and the draft lease agreement to the FAC as Exhibits A and B,

9

respectively. All earlier references to the letter as " 'the LOI' " were removed from the FAC; instead, the FAC referred to the letter simply as "Exhibit 'A.' " Otherwise, Evans maintained the letter was "a binding contract" between the parties. She alleged that "[u]nder the parties' contract, Bosa was obligated to lease the [Pacific Gate] space" to her "under terms and conditions substantially consistent with those outlined in" the letter. Evans again alleged the draft lease agreement "evidence[d] [her] own performance of her obligation to negotiate in good faith towards execution of a long form written lease agreement." However, "Bosa breached the parties' contract by failing and refusing to negotiate in good faith, sign and return a written lease agreement in substantial conformance with the material terms of [the letter], and by outright preventing the parties' contract from reaching fruition through a signed lease agreement; an act completely within Bosa's control."

In support of the breach of duty to negotiate in good faith claim, Evans alleged in the FAC that, "[t]o the extent Bosa contends [the letter] does not itself represent a binding contract concerning the contemplated lease for any reason, it *does* represent a binding agreement to negotiate in good faith and Bosa's failure and/or refusal to negotiate in good faith a long form lease in substantial conformance with the material terms of [the letter] represents a breach of that duty to negotiate in good faith." (Boldface omitted.)

Finally, Evans alleged, in support of the newly added promissory estoppel claim, the letter was a "clear and unambiguous promise" by Bosa to lease the Pacific Gate space to her. And that "HM and Bosa, through their . . . conduct and communications, caused [Evans] to believe that she had a valid and binding agreement with Bosa that required Bosa to enter into a long form lease agreement . . . under the material terms and conditions of [the letter]." Evans "justifiably relied" on Bosa's promise to negotiate in good

10

faith towards a lease agreement and, as a result, "incurr[ed] and expend[ed] thousands of dollars in expenses" and "refrain[ed] from finding alternative rental premises for her [s]tudio, all to [her] legal detriment." Evans alleged she would "suffer irreparable harm absent specific enforcement" of the letter and the draft lease agreement, and she had "no adequate remedy at law because [the letter] involved the transfer of a unique property through a contemplated long form lease."

Among other relief, Evans sought at least $500,000 in compensatory damages and specific performance of the "formal long form lease agreement" as "contemplated" in the letter. She also sought "attorney[ ] fees as permitted by contract or statute."

Bosa demurred again. Bosa asserted Evans had "re-filed the same core complaint with the same core facts, adding only a few fringe details," and that the FAC "fail[ed] in any meaningful way to address the major shortcomings" of the original complaint that was the basis of the trial court's sustaining Bosa's first demurrer. As it did in the first demurrer, Bosa again argued, "[t]he FAC reveals *no* binding agreement of any sort," and "merely proffers (a) a non-exclusive Letter of Intent ('LOI') that contains *no obligatory language of any type,* and is expressly subject to conditions, including (not surprisingly) consummation of a lease which never occurred, and (b) a long form *unsigned redlined draft lease . . .* reflecting roughly 60 comments and proposed edits, addressing numerous material[ ] terms—39 of which were expressly '[n]ot agreed to.' " Bosa further asserted "[e]ven the 'new' promissory estoppel claim is bound and tethered to [the same] ill-suited documents, which contain *no obligations for anyone to do anything.*"

Evans opposed the second demurrer. She argued the letter did not contain the words " 'letter of intent' " or " 'non-binding.' " She asserted,

11

instead, that the letter was an offer, which she accepted, thereby forming a valid contract. But in the event the trial court concluded otherwise, she asserted the letter "undeniably created a duty on the part of both contracting parties to negotiate in good faith towards execution of a long form lease agreement." Evans conceded the letter expressly contained three contingencies, but argued the FAC adequately alleged Bosa impermissibly prevented satisfaction of the third contingency by refusing to negotiate the long form lease in good faith. Evans also asserted the FAC adequately pled a claim for promissory estoppel based on "Bosa's written promise . . . to let the Premises to [Evans] subject to the material terms reflected in [the letter]."

Evans reserved "the right to further amend to the extent the [c]ourt rules in favor of Bosa on any issue and the [c]ourt's ruling evidences the potential for further amendment." After receiving the trial court's tentative ruling sustaining the demurrer as to all three causes of action without leave to amend, Evans' attorney argued the court should grant Evans leave to amend "to assert the other oral promises and other negotiations and discussions and frankly promises that were made by Bosa during the course of the negotiation of [the draft lease agreement]." Counsel further explained, "there were various promises made by Bosa to the effect of, quote, you know, we have a deal. All we need are your renderings. All we need are the final equipment lists that you are going to put in this place. There were all these promises made to my client upon which she relied to then go out and incur a lot of expense that she's entitled to recover on that cause of action." In response, Bosa's counsel asserted Evans could not "rely on oral representations when the parties are negotiating and require a signed lease in order to have a deal." It again found the "[e]ssential terms were not agreed upon in" either the letter or the draft lease agreement. The court

12

cited the same example regarding the parties inability to agree on the essential term of the rentable square footage which would determine the amount of rent. As it had found in the prior ruling, the draft lease agreement "contain[ed] many other significant redline changes, indicating that the parties were in the midst of negotiating 'toward a mutual lease execution.' "

Thus, the court concluded the allegations in the FAC were insufficient to establish a cause of action for breach of contract, and consequently were also insufficient to support a claim for breach of duty to negotiate in good faith. The court further concluded the newly asserted promissory estoppel claim failed because the "language of the proposal" set forth in the letter did not constitute "a clear promise, but rather an invitation to continue negotiations." Finally, the court found Evans had "not indicated how she could amend her pleading to allege an enforceable agreement." The court sustained the demurrer without leave to amend and entered a judgment of dismissal as to the claims asserted against Bosa.

C.    *Bosa's Request for Attorney Fees*

After entry of the judgment of dismissal, Bosa moved for $104,545 in attorney fees, pursuant to Civil Code section 1717 (section 1717) and a prevailing party attorney fee provision in the draft lease agreement. The trial court awarded Bosa the full $104,545 it had requested in attorney fees. Evans timely appealed from both the judgment of dismissal and the order awarding Bosa attorney fees. We will discuss the trial court's order awarding attorney fees to Bosa more fully in considering Evans' challenge to that order, *post*.

13

DISCUSSION

I.

*The FAC Fails to Allege Facts Sufficient to State a Cause of Action*

Our review of the judgment of dismissal and the order sustaining Bosa's demurrer to the FAC is de novo. "In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory." (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 162; *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.) "If the demurrer was sustained, as it was in this case, our function is to determine whether the complaint states sufficient facts to state a cause of action; and if it was sustained, as it was here, without leave to amend, 'we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm.' " (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1381 (*Careau*), quoting *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).)

"In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*Blank, supra,* 39 Cal.3d at p. 318.) "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Ibid.*) We may "take notice of exhibits attached to the complaints," and "[i]f facts appearing in the exhibits contradict those alleged, the facts in the exhibits take precedence." (*Holland v. Morse Diesel Internat., Inc.* (2001) 86 Cal.App.4th 1443, 1447 (*Holland*).) We may also consider prior versions of the pleading, particularly where previous

14

allegations are altered or omitted without adequate explanation. (*Shoemaker v. Myers* (1990) 52 Cal.3d 1, 12 (*Shoemaker*) [appellate court properly considered allegations in first complaint when testing the sufficiency of the third]; *Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1109 (*Pierce*) [considering changes to an unverified pleading in response to a demurrer].)

Applying these principles of review, we conclude, as the trial court did, that Evans fails to allege in the FAC sufficient facts to state a cause of action. And because Evans has not established how she could amend the complaint further to state a legally cognizable claim, we find no abuse of discretion in the court's ruling sustaining the demurrer without leave to amend.

A.    *Breach of Contract Claim*

To state a claim for breach of contract, a complaint must allege: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239.)

Here, Evans alleged in the FAC: (1) the letter, attached as Exhibit A, "constitute[d] a binding contract subject to three stated contingencies"; (2) all contingencies "were satisfied with the sole exception of the execution of a long form lease agreement" and Evans made good faith efforts to negotiate the long form lease agreement; (3) "Bosa breached the parties' contract by failing and refusing to negotiate in good faith, sign and return a written lease agreement in substantial conformance with the material terms of" of the letter; and (4) Evans suffered damages as a result. Evans asserts we must accept these allegations as true and doing so precludes sustaining Bosa's demurrer. Not so. We need *not* accept " 'contentions, deductions or conclusions of fact or law' " as true. (*Blank, supra,* 39 Cal.3d at p. 318; see

15

also *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 808 [" 'conclusory allegations will not withstand demurrer' "].) And where, as here, an exhibit to a complaint contradicts an alleged fact, "the facts in the exhibits take precedence." (*Holland, supra,* 86 Cal.App.4th at p. 1447.)

On its face, the letter was not a binding contract between Evans and Bosa. It was a letter of intent from Bosa's real estate broker to Evans' real estate broker. It stated, "the Landlord [Bosa] has asked me to provide you with . . . the general terms and conditions which the Landlord *would consider* as the basis for a lease agreement." (Italics added.) Further, as Evans concedes, it set forth three explicit contingencies, including "[m]utual execution of the Lease." It concluded by stating, "[w]e look forward to your response and to *moving toward* mutual lease execution." (Italics added.) This language clearly demonstrates the purpose of the letter is to establish a starting place for negotiations. It did not state, or otherwise establish, an agreement on behalf of Bosa to lease the space to Evans. Rather, it provided the initial terms upon which Bosa *would consider* a lease, and then expressly conditioned any such lease on, among other things, mutual execution of a formal document setting forth *all* associated terms.

Evans nevertheless asserts that "Bosa offered to lease the premises to [her] on the terms stated [in the letter]," and that a valid contract was formed when she accepted the offer by signing and returning the letter without making any changes. We disagree. "It is a basic tenet of contract law that creation of a valid contract requires mutual assent." (*Rennick v. O.P.T.I.O.N. Care, Inc.* (9th Cir. 1996) 77 F.3d 309, 315 (*Rennick*); Civ. Code, § 1550 [Mutual assent, or consent, of the parties "is essential to the existence of a contract."].) " 'A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that

16

the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.' " (*Rennick*, at p. 315, quoting Rest.2d Contracts (1981) § 26; see also *Careau, supra,* 222 Cal.App.3d at p. 1389 [quoting the same language].)  "Where any of the terms are left for future determination or there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." (*Smissaert v. Chiodo* (1958) 163 Cal.App.2d 827, 830–831 (*Smissaert*).)  A letter that does not indicate an intent to be bound absent an additional formal written agreement is generally considered to be a non-binding letter of intent. (See *Rennick,* at p. 315; *Careau* at pp. 1381–1382.)

Here, as we have explained, the letter expressed an initial set of terms under which Bosa "would consider" leasing the space to Evans, explicitly contingent on mutual execution of a formal lease, among other conditions. That contingency is, by its plain language, a clear indication that there would be no agreement until the parties executed a formal writing.  Since the subsequent formal writing, the long form lease, was never executed, there was no binding contract between the parties.[7]  (See *Smissaert, supra*, 163 Cal.App.2d at pp. 831–832 [finding no binding contract where writing

---

[7]    Evans references "the prevention doctrine" in a footnote in her opening brief, but does not develop the argument and has therefore forfeited the argument on appeal.  (*People v. Aguayo* (2019) 31 Cal.App.5th 758, 768 [failure to present a sufficiently developed argument supported with citations to legal authority results in forfeiture of issue on appeal]; Cal. Rules of Court, rule 8.883(a)(1)(A) [appellate briefs must state each point under a separate heading]; see also *Hines v. Lukes* (2008) 167 Cal.App.4th 1174, 1184–1184 [Civil Code section 1511, subdivision 1, establishes a rule, often referred to as the prevention doctrine, "that a party's prevention of performance by another party excuses the nonperformance."].)

specified, " 'the *validity* of said *proposed* agreement is subject and conditioned upon the parties *agreeing upon and reducing to writing all terms and conditions necessary and incidental* to the *validity* of said *proposed* agreement' "].)

Evans argues the letter did not explicitly state the parties will not be bound absent a later signed agreement. But, similar to the language at issue in *Smissaert*, the letter did clearly manifest *a mutual intent not to be bound* with its express statement that any agreement was contingent upon the mutual execution of a formal lease. (See *Smissaert, supra*, 163 Cal.App.2d at pp. 831–832.) Notably, with the exception of the words "Agreed and Accepted" above the signature line, there is no language anywhere in the letter indicating that either party agreed to do anything. Rather than pointing to any such language, Evans attempts to turn the third *contingency* on its head, asserting that it somehow represented an *agreement* to execute a long form lease. In doing so, Evans ignores the plain language of the letter: "This proposal shall be subject to *and contingent upon* the following: . . . [¶] C. *Mutual execution of the Lease*." (Italics added.)

Evans points out the letter was titled as a "Proposal to Lease," and not a "letter of intent." Regardless of title, though, the form and content of the letter evidenced that it was, essentially, a non-binding letter of intent. " 'Letter of intent' is not a legal term of art. . . . Generally, 'letter of intent' refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract." (*Rennick, supra,* 77 F.3d at p. 315.) " 'The purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual objective. Instead, it is only "to provide the initial framework from which the parties *might* later negotiate a final . . . agreement, if the deal works out." ' " (*Ibid.*, italics added.)

18

"Commonly a letter of intent is used so that people negotiating toward an agreement, who do not yet have one, can get their preliminary inclinations down on paper without committing themselves." (*Ibid.*)

The plain language of the opening paragraph of the letter makes clear that this was precisely what Bosa intended: to put down on paper an initial framework that Bosa "*would consider* as the basis for a lease agreement." (Italics added.) Any agreement was then made expressly contingent upon the mutual execution of a long form lease, further emphasizing that the letter simply represented a starting place, and not an agreement in and of itself. Evans' own characterization of the letter as " 'the LOI' " in her original complaint suggests that she, too, understood that it was intended as a letter of intent. As noted, after the trial court concluded, in response to Bosa's first demurrer, that the letter was not a binding contract, Evans removed all references to " 'the LOI,' " and instead referred to the letter only as "Exhibit 'A' " in the FAC. But Evans cannot plead around the trial court's conclusion regarding the non-binding nature of the letter by simply changing the words she uses to describe it. (See *Shoemaker, supra,* 52 Cal.3d at p. 12 [appellate court properly considered allegations in first complaint when testing the sufficiency of the third]; *Pierce, supra,* 1 Cal.App.4th at p. 1109 [considering changes to an unverified pleading in response to a demurrer].)

Evans further asserts that even if the letter is appropriately characterized as a letter of intent, it could still be binding, depending on the expectation of the parties. Again, though, the express language of the letter makes clear the intent of the parties was to memorialize a starting place for further negotiations, but that any agreement was expressly contingent upon mutual execution of a long form lease. The parties then proceeded to negotiate the long form lease, but were ultimately unable to reach agreement

19

on a binding contract.  This is not a case, like those that Evans relies upon, where the writing at issue expressly indicated the parties *agreed to execute* a formal written contract memorializing an existing agreement as to all material terms.  (See, e.g., *Mann v. Mueller* (1956) 140 Cal.App.2d 481, 485–487 [finding a binding contract where parties agreed to material terms in a writing that stated, " 'Both parties shall enter into a satisfactory written agreement' "]; *Gavina v. Smith* (1944) 25 Cal.2d 501, 504 [concluding an option agreement that attached the lease that was to be executed if the option was exercised created a binding agreement without the need for any further writing].)

Finally, Evans contends the trial court improperly relied on the draft lease agreement as extrinsic evidence the parties had not reached an agreement as the essential terms of a lease.  Because our review is de novo, we are not bound by the trial court's analysis.  Regardless, in our view, the trial court was simply responding to Evans' own contention that the draft lease agreement "demonstrates an agreement as to the terms for which no 'redline' changes [were] made."  As the trial court explained, essential terms were not agreed upon in either the letter *or* the draft lease agreement.  Rather, the draft lease agreement demonstrates the parties were "in the midst of negotiating 'toward a mutual lease execution,' " which never came to fruition.

In sum, we conclude, as the trial court did, that neither the letter nor the draft lease agreement formed a binding contract.  We therefore conclude the allegations in the FAC are insufficient to state a cause of action for breach of contract.

B.      *Breach of Duty to Negotiate in Good Faith Claim*

In the alternative, Evans contends the letter is, at a minimum, an agreement to negotiate the terms of a lease agreement in good faith, and the FAC sufficiently pled a cause of action for breach of that agreement.

Evans relies exclusively on *Copeland v. Baskin Robbins U.S.A.* (2002) 96 Cal.App.4th 1251, 1260 (*Copeland*) and argues the case supports her cause of action for breach of duty to negotiate in good faith. It does not. The alleged agreement at issue in *Copeland* centered around the acquisition of an ice cream manufacturing plant. The plaintiff, Copeland, had expressed an interest in acquiring the plant from Baskin Robbins, but had made clear from the outset that any agreement would be contingent on Baskin Robbins also entering into a co-packing agreement, under which Baskin Robbins would purchase a set amount of ice cream from Copeland over the course of the next several years. (*Id.* at p. 1253.)

After several months of negotiations, "Baskin Robbins sent Copeland a letter [in May 1999], which stated in relevant part: 'This letter details the terms which our Supply Chain executives *have approved* for subletting and sale of our Vernon manufacturing facility/equipment and a product supply agreement . . . (1) Baskin Robbins *will sell* [Copeland] Vernon's ice cream manufacturing equipment . . . for $1,300,000 cash . . . (2) *Baskin Robbins would agree, subject to a separate co-packing agreement and negotiated pricing*, to [purchase] 3,000,000 gallons in year 1, 2,000,000 gallons in year 2 and 2,000,000 in year 3. . . . If the above is acceptable please acknowledge by returning a copy of this letter with a non-refundable check for three thousand dollars. . . . We should be able to coordinate a closing [within] thirty days thereafter.' Copeland signed a statement at the bottom of the letter agreeing '[t]he above terms are acceptable' and returned the letter to Baskin Robbins

21

along with the $3,000 deposit." (*Copeland, supra,* 96 Cal.App.4th at pp. 1253–1254, italics added.)

Approximately two months later, Baskin Robbins unilaterally ended the negotiations based on " 'strategic decisions around the Baskin Robbins business.' " (*Copeland, supra,* 96 Cal.App.4th at p. 1254.) Copeland sued Baskin Robbins and alleged Baskin Robbins had "entered into a contract which provided Baskin Robbins would enter into a co-packing agreement with Copeland under the terms set out in the May 1999 letter and additional terms to be negotiated." (*Id.* at pp. 1254–1255.) Copeland further alleged that Baskin Robbins breached the agreement by " 'refusing to enter into *any* co-packing agreement.' " (*Id.* at p. 1255, italics added.) The trial court concluded the May 1999 letter "failed as a contract because the essential terms of the co-packing deal were never agreed to" and granted summary judgment in favor of Baskin Robbins. (*Ibid.*)

On appeal, Copeland asserted the May 1999 letter "constituted a contract to negotiate the remaining terms of the co-packing agreement and Baskin Robbins breached this contract by refusing without excuse to continue negotiations or, alternatively, by failing to negotiate in good faith." (*Copeland, supra,* 96 Cal.App.4th at p. 1256.) The appellate court noted California law "provides no remedy for breach of an 'agreement to agree,' " but concluded "[a] contract to negotiate the terms of an agreement is not, in form or substance, an 'agreement to agree.' " (*Id.* at pp. 1256–1257.) The court explained, "[i]f, despite their good faith efforts, the parties fail to reach ultimate agreement on the terms [at] issue[,] the contract to negotiate is deemed performed and the parties are discharged from their obligations. Failure to agree is not, itself, a breach of the contract to negotiate." (*Id.* at p. 1257.) Further, while parties generally do not have a duty to negotiate in

22

good faith in the absence of a contractual relationship, "when the parties are under a contractual compulsion to negotiate[,] . . . the covenant of good faith and fair dealing attach[es], as it does in every contract." (*Id*. at p. 1260.)

However, the court also concluded "damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. . . . The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been." (*Copeland, supra,* 96 Cal.App.4th at pp. 1262–1263.) Copeland had only claimed damages based on lost profits so, although the court held that a cause of action for breach of a contract to negotiate an agreement would lie, the court concluded summary judgment was appropriate on the alternate ground that Copeland had not adequately pled damages. (*Id*. at p. 1264.)

The letter in this case is unlike the letter at issue in *Copeland*. Here, the letter did not purport to present " 'terms which [Bosa, or its executives, had] *approved*,' " nor did it indicate that Bosa " 'would *agree*' " to lease the space to Evans subject to a separate agreement, or that the parties " 'should be able to coordinate a closing [within] thirty days.' " (*Copeland, supra,* 96 Cal.App.4th at pp. 1253–1254, italics added.) It merely presented general terms that Bosa "would *consider*" as a starting place for further negotiations. (Italics added.) Whether a writing constitutes a full-fledged agreement or an agreement to negotiate depends on the language of the writing itself. (*Los Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 495.) As we have explained, at most, the letter presented an offer to *begin* negotiations, and, as Evans pled in the FAC, Bosa did negotiate with Evans for more than a year before parting ways.

23

Even if we were to assume the letter represented an agreement to negotiate the long form lease in good faith, Evans still does not adequately plead facts that would establish a breach of that duty. At most, Evans alleged in the FAC that Bosa decided to go a different direction after "more than a year of negotiations." She then stated, in conclusory fashion, that "Bosa's failure and/or refusal to negotiate in good faith a long form lease in substantial conformance with the material terms of [the letter] represents a breach of [the] duty to negotiate in good faith." She did not provide any specific allegations of bad faith in the FAC.

To the contrary, the draft lease agreement demonstrated the parties *did* engage in good faith negotiations for a full year before Bosa decided not to continue negotiating with Evans. At that time, the parties were not yet in agreement on a number of significant terms, including for example, the representations and warranties Bosa would make regarding the condition of the property, which party was responsible for certain repairs and maintenance, and a provision precluding Evans from creating "excessive noise" in the operation of her fitness studio. As the court in *Copeland* explained, "[f]ailure to agree is not, itself, a breach of the contract to negotiate." (*Copeland, supra,* 96 Cal.App.4th at p. 1257.) When negotiations fail, it is almost always the case that one of the parties makes the final decision not to continue. Evans does not provide any argument or authority to support her assertion that Bosa's alleged decision to cease negotiations after a year constituted a breach of its obligation to negotiate in good faith, if it even had such an obligation in the first instance.

In sum, we conclude the letter, on its face, was not an agreement to negotiate and, even if it were, the allegations in the FAC are not sufficient to

24

establish that Bosa breached that agreement.  Thus, the FAC also does not state a claim for breach of agreement to negotiate in good faith.

C.    *Promissory Estoppel Claim*

To adequately plead a cause of action for promissory estoppel, a complaint must allege:  "(1) a promise, (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person, (3) the promise induces action or forbearance by the promisee or a third person (which we refer to as detrimental reliance), and (4) injustice can be avoided only by enforcement of the promise."  (*West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 803.)

Here, Evans failed to allege a promise for all of the same reasons already discussed with respect to the previous causes of action.  As the court in *Copeland* explained, "a cause of action for promissory estoppel might lie if the defendant made a clear, unambiguous promise to negotiate in good faith and the plaintiff reasonably and foreseeably relied on that promise in incurring expenditures connected with the negotiation.  We may also assume for the sake of argument such a cause of action could be based on an implied promise to negotiate in good faith.  If these propositions are correct, then promissory estoppel is just a different rubric for determining the enforceability of a contract to negotiate an agreement."  (*Copeland, supra,* 96 Cal.App.4th at pp. 1261–1262.)

As with the breach of agreement to negotiate claim, Evans asserts the letter constituted a "a clear, albeit contingent, promise to negotiate a long form lease agreement."  But as we have already concluded, the letter did not contain any binding agreement by Bosa to lease the space, or to negotiate or execute a lease.  For the same reasons, it also did not contain a promise by Bosa to negotiate or enter into a lease.  At most, the letter manifested an

25

intent to memorialize the basic terms and conditions Bosa would *consider* as a starting point for further negotiations.

D. *The Trial Court Did Not Abuse Its Discretion in Denying Evans Leave to Amend a Second Time*

Evans asserts the trial court abused its discretion by denying her leave to amend, and that she could further amend the FAC to state a claim for promissory estoppel based on oral promises Bosa made to her regarding the lease. No abuse appears on this record.

If an appellant shows, even for the first time on appeal, that her complaint could be amended to overcome a defense legal theory, we must reverse the judgment to allow that amendment. (*City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 746–747; *Ochs v. PacifiCare of California* (2004) 115 Cal.App.4th 782, 796.) However, the appellant has the burden of proving an amendment would cure the complaint's defect. (*Blank*, *supra,* 39 Cal.3d at p. 318; *Banis Restaurant Design, Inc. v. Serrano* (2005) 134 Cal.App.4th 1035, 1044.) "[W]hen a complaint contains allegations that are fatal to a cause of action, a plaintiff cannot avoid those defects simply by filing an amended complaint that omits the problematic facts or pleads facts inconsistent with those alleged earlier." (*Banis,* at p. 1044.)

At the hearing on Bosa's second demurrer, Evans' counsel argued: "[T]here were various promises made by Bosa to the effect of, quote, you know, we have a deal. All we need are your renderings. All we need are the final equipment lists that you are going to put in this place. There were all of these promises made to my client upon which she relied to then go out and incur a lot of expense that she's entitled to recover on that cause of action." In her briefing on appeal, Evans further asserts that discovery has since revealed that CBRE stated at one point, to HM, "we are a floor plan away from a deal."

26

In response to this latter allegation, Bosa filed a motion to strike portions of the record and Evans' opening brief. Bosa asserts we should not consider evidence that was not before the trial court at the time it sustained Bosa's second demurrer, and we further should not consider any arguments based on such evidence. Generally, we do not consider such evidence on appeal. (See *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813 ["when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered"].) However, in the context of a demurrer, we accept the factual allegations in a complaint as true. And so, we need not consider the record or additional evidence to evaluate Evans' assertion that she could amend the complaint to allege Bosa made oral promises that she relied upon. We deny Bosa's motion to strike.

Even so, the additional allegations are not helpful to Evans. At most, Evans asserts Bosa told her they were a floorplan, renderings, and/or an equipment list *away* from a deal. But Evans previously alleged, in both the original complaint and the FAC, that Bosa "never repudiated its obligation to lease space" to her, and instead told her that she was " 'a perfect match' for Pacific Gate," and that the parties "had a 'deal.' " The additional statements Evans now alleges are not materially different than those previously alleged statements. None of the statements were promises that Evans could have reasonably relied upon, and Evans does not present any authority to suggest that they are. Rather, the newly alleged statements are further evidence the deal was not yet done, and that Bosa needed additional information before entering into a binding agreement. Accordingly, we find no abuse of discretion in the trial court's decision not to grant Evans a second leave to amend.

27

On our independent review, we conclude the trial court properly sustained Bosa's second demurrer without leave to amend, and appropriately entered judgment of dismissal of the claims asserted against Bosa.

## II.

### *The Trial Court Did Not Err in Awarding Bosa Attorney Fees*

After the trial court entered the judgment of dismissal, Bosa sought an award of $104,545 in attorney fees pursuant to section 1717 and the following provision of the draft lease agreement:

> "If either Party brings an action or proceeding involving the Premises to enforce the Terms hereof or to declare rights hereunder, then the Prevailing Party (as hereafter defined) shall be entitled to reasonable attorney[ ] fees in any such proceeding, action, or appeal thereon. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term 'Prevailing Party' shall include, without limitation, a Party who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment or the abandonment by the other Party of its claim or defense. The attorney[ ] fee award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorney[ ] fees reasonably incurred." (Boldface omitted.)

Section 1717, subdivision (a) states, "where [a] contract specifically provides that attorney[ ] fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, . . . shall be entitled to reasonable attorney[ ] fees in addition to other costs." "It is [also] settled that a party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fees had it prevailed.' " (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 870 (*Hsu*); accord *Hom v. Petrou* (2021) 67 Cal.App.5th

459, 465 (*Hom*) [Section 1717 makes an attorney fees provision reciprocal by "allow[ing] 'a party who defeats a contract claim by showing the contract did not apply or was unenforceable to nonetheless recover attorney fees under that contract if the opposing party would have been entitled to attorney fees had it prevailed.' "].)

In opposing Bosa's motion for attorney fees, Evans did not dispute the reasonableness of the fees sought. Rather, she asserted the claims in the FAC were "alleged to arise purely" under the letter, not the draft lease agreement, and the letter did not contain an applicable attorney fee provision. She argued, "[t]he only reference the [letter] makes to attorney fees" is that the prevailing party in an action to enforce "a proposed confidentiality provision[ ] [in] the lease contemplated by the [letter]" would be entitled to fees. Since she made "no such claim" that the proposed confidentiality provision had been violated, Evans asserted attorney fees were unavailable to Bosa.

In ruling on Bosa's motion, the trial court noted the letter and the unsigned draft lease agreement do contain "different attorney[ ] fees provisions." The draft lease agreement, attached as Exhibit B to the FAC, "broadly provide[d] '[i]f either Party brings an action or proceeding involving the Premises to enforce the Terms hereof or to declare rights hereunder, then the Prevailing Party . . . shall be entitled to reasonable attorney[ ] fees in any such proceeding, action, or appeal thereon." The court further noted that Evans did not dispute that if the attorney fee provision in the draft lease agreement applied, "then [Bosa] would be entitled to attorney[ ] fees as the prevailing party."

The trial court then observed that Evans expressly alleged in both the original complaint and the FAC that the draft lease agreement reflected the

29

parties' agreement as to the material terms that were not redlined in the draft lease agreement. The court further observed that Evans' discovery responses "reveal[ed] [she] contended that Bosa had 'reached agreement on all material terms' " in the draft lease agreement. Further still, Evans herself sought specific performance " 'of the LOI <u>and contemplated formal long form lease agreement</u>' " in the original complaint, and also requested attorney fees in both the original complaint and the FAC "for her efforts to enforce her rights, which included enforcement of 'a formal long form lease agreement.' " (Boldface omitted.) The court observed that Evans "may not now deny that she sought to enforce the purported lease based on [the draft lease agreement]."

Relying on *Hsu*, the trial court concluded that "[i]f [Evans] would have prevailed, the 'material' terms of [the draft lease agreement] would have applied, as [Evans] alleges the attorney[ ] fees provision was not redlined, and [Evans] would have been entitled to attorney[ ] fees. As such, the reciprocal requirement of [section] 1717 dictates Bosa is entitle[d] to recover attorney[ ] fees." The court then awarded Bosa the full $104,545 it had requested in attorney fees.

In challenging the trial court's order awarding Bosa attorney fees, Evans raises the same contentions. She asserts there was no legal basis for the court to award attorney fees to Bosa because her claims were based solely on the contract allegedly formed by the letter, and the letter did not contain an applicable attorney fee provision. While the trial court has broad discretion to determine whether a litigant is the prevailing party and the amount of attorney fees to award, " 'a determination of the legal basis for an attorney fee award is a question of law to be reviewed de novo.' " (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751;

30

see also *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332 [determination of prevailing party is reviewed for an abuse of discretion but questions of law are reviewed de novo]; *Carver v. Chevron U.S.A., Inc.* (2002) 97 Cal.App.4th 132, 142 ["to determine whether an award of attorney fees is warranted under a contractual attorney fees provision . . . [w]here extrinsic evidence has not been offered to interpret the lease, and the facts are not in dispute, such review is conducted de novo"].)  Because Evans disputes only the legal basis for the award, our review is de novo.

We independently conclude that Evans' claims were not based solely on the letter, for the same reasons the trial court did.  Evans alleged in the FAC that "Exhibit 'B' [the draft lease agreement] reflects the parties *were in agreement* on the material terms of the long form lease agreement," and the draft lease agreement "makes clear, Bosa did not dispute its agreement to lease to [Evans] under the terms reflected in [the draft lease agreement] for which no 'redline' changes were made." (Boldface omitted.)  Further, under the promissory estoppel cause of action, Evans alleged she would "suffer irreparable harm absent specific enforcement of Exhibits 'A' and 'B' "—that is, the letter *and* the draft lease agreement.  Further still, in the FAC's prayer for relief, Evans sought "specific performance of [the] contemplated formal long form lease agreement."  We agree with the trial court that Evans cannot now disavow that "she sought to enforce the purported lease based on [the draft lease agreement]."

Evans asserts the original complaint and FAC sought only specific performance by way of executing *a* formal lease agreement, and not necessarily the draft lease agreement in the form we see in Exhibit B.  We are not persuaded.  It is undisputed that the draft lease agreement was the *only* long form lease contemplated by the parties.  Further, the letter clearly

31

contemplated the inclusion of additional terms in the requisite long form lease and, as discussed, Evans alleged in both the original complaint and the FAC that the parties agreed to the additional terms in the draft lease agreement that were not redlined, including the attorney fee provision. There is nothing in either pleading suggesting the trial court should have enforced a long form lease agreement *other* than what Evans attached as Exhibit B, nor was there any other long form lease agreement for the court to enforce. Reading the relevant allegations in the context of the entire original complaint and FAC, it is apparent Evans sought to enforce at least the material, allegedly agreed upon terms of the draft lease agreement, as well as the letter. Indeed, in response to Bosa's first demurrer, Evans asserted the original complaint adequately pled a cause of action for breach of contract "based *both* on the accepted proposal/offer attached to the complaint [Exhibit A] *and* the lease Bosa later refused, in bad faith, to sign [Exhibit B]."

Evans nevertheless asserts her claims were not brought " 'on the contract' " containing the attorney fee provision, but the cases she relies upon do not support her position.

In *Brittalia Ventures v. Stuke Nursery Co., Inc.* (2007) 153 Cal.App.4th 17, the court concluded the prevailing plaintiff was not entitled to an award of attorney fees based on a provision in a contract that was not asserted in the operative complaint, and was, instead, asserted only by the defendant in defense of the asserted claims. (*Id.* at p. 29.) Although the plaintiff had successfully argued the competing contract asserted by the defendant was not controlling, the court concluded the plaintiff could not rely on an attorney fee provision in the competing contract because the action itself was not based on *that* contract. (*Id.* at p. 30.) Considering the plain language of section 1717, the court explained that an award of attorney fees must be based on a

32

provision in the contract the action seeks to enforce. (*Id*. at pp. 28–31; see also § 1717 ["In any action *on a contract*, where the contract specifically provides that attorney[ ] fees and costs, which are incurred *to enforce that contract* . . . ." (Italics added.)].)

*Brittalia* is inapposite. As discussed, Evans brought the action, at least in part, to enforce the draft lease agreement. At a minimum, Evans sought specific enforcement of at least those terms not redlined in the draft lease agreement. Bosa did not seek to enforce the draft lease agreement as an alternative to the letter; rather, Bosa argued, in defense of the claims asserted against it in the complaint and the FAC, that *neither* the letter nor the draft lease agreement formed a binding contract.

In *Sessions Payroll Management, Inc. v. Noble Constr. Co, Inc.* (2000) 84 Cal.App.4th 671, the court determined a party to a contract was not entitled to an award of award attorney fees against a subcontractor who did not sign and was not a party to the contract, in part because the subcontractor would not have been entitled to such an award if it had been the prevailing party. (*Id*. at p. 674.) Similarly, the prevailing party in *Khajavi v. Feather River Anesthesia Medical Group* (2000) 84 Cal.App.4th 32, also sought attorney fees based on an attorney fee provision in a contract that he was not a party to. (*Id*. at p. 59.) The plaintiff in *Khajavi* had entered into an oral employment agreement with the defendant that admittedly did not include an attorney fee provision, but asserted he was entitled to attorney fees based on a provision in written employment contracts that *other* employees subsequently entered into with the defendant. (*Id*. at pp. 59–60.) The court concluded the plaintiff could not rely on the employment contracts of the other employees, and there was no mutual assent between the plaintiff and defendant because they never discussed or agreed to an attorney fee

33

provision in any form. (*Id.* at p. 60.) To state the obvious, there are no third-party contracts or third-party beneficiary claims at issue in this case; neither party was seeking to enforce a contract that it was not a party to.

The trial court correctly concluded Evans' claims were based on the draft lease agreement. And, as the trial court also correctly concluded, if Evans had prevailed and the court had ordered enforcement of the agreed upon terms of the draft lease agreement—or as Evans put it, the terms "not redlined"—Evans would have been entitled to attorney fees pursuant to the broad attorney fee provision in the draft lease agreement, which was not a redlined term. The trial court correctly ruled that because Bosa was successful in showing the nonexistence of a contract, the reciprocal requirement of section 1717 entitled Bosa to recover its attorney fees.[8] (See *Hsu, supra,* 9 Cal.4th at p. 870; *Hom, supra,* 67 Cal.App.5th at p. 465.)

---

[8] "Where fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion." (*Amtower* v. *Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1604.) Although Evans argues Bosa was not entitled to an award of attorney fees under each individual cause of action alleged in the original complaint and the FAC, she did not argue the fees should be allocated in the trial court or on appeal.

## DISPOSITION

The judgment of dismissal and the order awarding Bosa attorney fees are affirmed. Bosa is awarded its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

DO, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.